IN THE UNITED STATES DISTRICT COURT

RALPH REED

      PETITIONER

V.

No.   0 6 -   4 4 5

THOMAS L. CARROLL

      D.C.C. WARDEN

      RESPONDENT

FILED

JUL 2 1 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

1. APPENDIX TO Petitioner
MEMORANDUM OF LAW
IN SUPPORT OF HABEAS CORPUS

DATE: 6-17-06

Ralph Reed

Delaware correctionnal center
1181 Paddock Road
Smyrna Delaware 19977

# Table of Contents

Pages

Jury selection Transcripts ............................................. A 1 to 2

Officer M. Holcumb Trial Testimony ........................ A 3 to A4

Officer K. marvel Trial Testimony ........................ A 4 9

S. DeShield Trial Testimony ................................. A 5 to A 17

S. Handy Trial Testimony ..................................... A 18 to A20

J. Hopkins Trial Testimony .................................. A 21

J. Jefferson Trial Testimony ............................... A 22 to A 23

S. Dixon Trial Testimony ..................................... A 24

S. west Trial Testimony ...................................... A 25 to A 58

K. Horsey Trial Testimony .................................... A 59 to A61

E. Reed Trial Testimony ...................................... A 62

T. Johnson Trial Testimony ................................... A 63

Defense Counsel's Closing Arguments ...................... A 64 to A6

Ralph Reed Letter dated Feb. 25, 2005 to Judge Graves ....... A 69 to 69

Ralph Reed Letter dated April 27, 2005 to Judge Graves ... A 70 to 75

Ralph Reed Letter/Brief dated Dec. 20, 2004 to Judge Graves ... A 76 to A10

Affidavit of Jerome Reed ................................... A 102 to A 10

Evidentiary Hearing Transcripts: .......................... A

J. Reed's Testimony ........................................... A 104

S. Lewis Testimony ........................................... A 105 to A 11

Officer Zolper Testimony ..................................... A 116 to A12

Judge Graves Final Decision Oct. 5, 2005 ................... A 121 to A 14:

Trial court's Jury Instructions ........................... A 149 to A15

Affidavit of James Riley .................................... A 153 to A 15

Complaint And warrant ....................................... A 156 to A15

Affidavit of probable cause ................................. A 158 to A 15

Continuation Sheet                           A 160
Grand Jury Indictment                        A 161 to 162
404(B) Transcripts                           A 163 to 171
Supreme court order                          A172 to173

1    trial will begin today and we estimate it will take

2    two weeks.

3           Do you know anything about this case through

4    personal knowledge, discussion with anyone, the news

5    media, or any other source?

6           Do you know the defendant or his friends or

7    relatives?

8           The State is represented by James W. Adkins,

9    a Deputy Attorney General.  The defendant is

10   represented by Karl Haller.

11          Do you know the attorneys in this case or any

12   other attorney or employee in the Office of the

13   Attorney General or defense counsel?

14          Do you know any of the following persons who

15   might be called to testify as witnesses:  Detective

16   James Fraley, Delaware State Police; Detective Robert

17   Hawkins, Delaware State Police; Detective Curt Brown,

18   Delaware State Police; Detective Keith Marvel,

19   Delaware State Police; Detective Brian Conlin,

20   Delaware State Police Troop 4; Sergeant Scott

21   Galbreath, Delaware State Police Troop 2; Corporal-

22   Ronald Voshell, Delaware State Police Troop 5;

23   Sergeant Steve Swain, Delaware State Police Troop 4;

DAVID WASHINGTON
Official Court Reporter



1   Sharon Tull, Millsboro; Elroy Collick, Laurel,

2   Delaware.

3           Do you know the victim, Gregory Howard?  .

4           Do you have any bias or prejudice either for

5   or against the State or the defendant?

6           Do you have any religious or conscientious

7   reasons as to why you cannot serve as a juror in this

8   case?

9           Is there any reason why you cannot give this

10  case your undivided attention and render a fair and

11  impartial verdict?

12          Once again, this trial will begin today and

13  will last approximately two weeks.  If your answers to

14  any of the above questions is yes or you cannot serve

15  through May 19th, please come forward.

16          THE COURT:  Let me see counsel at the

17  sidebar.

18          (Whereupon, counsel approached the bench and

19      the following proceedings were had:)

20          THE COURT:  It may be helpful that since the

21  State is not seeking the death penalty that we make

22  the jury panel aware of that.

23          MR. HALLER:  Yes, I was going to ask that.

DAVID WASHINGTON
Official Court Reporter



1    A.    It was foggy.  Officer Tyndall was the lead
2    car.  I was following Officer Tyndall, proceeded
3    through the intersection and I happened to catch the
4    sight of a Bronco into a house to my right.  So I
5    turned my car in and lit it up with my headlights.
6         Q.    What did you find when you arrived?
7         A.    When my headlights lit up the back of the
8    car, I could see what appeared to be bullet holes in
9    the back windshield.
10        Q.    What did you do next?
11        A.    I immediately approached the vehicle to see
12   if there were any victims inside.
13        Q.    What did you see?
14        A.    I found the lone occupant, the driver, seated
15   on the driver's seat, leaning over with his shoulder
16   and head resting on the passenger front seat.
17        Q.    What did you do?
18        A.    I reached in and grabbed his wrist for a
19   pulse.  He had a pulse.  He was struggling for breath
20   at that time.
21        Q.    Was the car on or off at that point?
22        A.    The car was running.  It was in gear.
23        Q.    Did you do anything to get the car out of

1        A.   No.   That's who came down to me at the second

2    scene.   I don't know who the first detective was that

3    showed up.

4        Q.   It could have been somebody other than

5    Detective Keith Marvel?

6        A.   Yes.

7             MS. TSANTES:  No further questions.

8             THE COURT:  Mr. Haller?

9                      CROSS-EXAMINATION

10   BY MR. HALLER:

11       Q.   What was the route you took to Sixth and

12   Crockett?

13       A.   We were at the station, which is on the

14   corner of Poplar and Mechanic Street.  We came up

15   Mechanic Street to West Street, made a right, then a

16   left on Sixth Street.  It's Townsend there, which

17   brings you out on Sixth Street and continued west over

18   to Crockett.

19       Q.   How would you describe the weather?

20       A.   Foggy.

21       Q.   Was it raining or misting?

22       A.   I believe it was misting a little bit.

23       Q.   When you got to the corner of Seventh and

DAVID WASHINGTON
Official Court Reporter

A - 4

YVONNE DeSHEILDS - DIRECT

1       Q.   And what were you doing that night at about

2   those times, where were you?  Where did you go?  If

3   you can tell us what you were doing?

4       A.   I had been in front of the store.

5       Q.   The deli?

6       A.   The deli.  Then I crossed over from the deli

7   and I was standing on the walk in front of the house

8   of Herman Dark.

9       Q.   Does Herman Dark have a nickname?

10      A.   Muddy.

11      Q.   What were you going over to Muddy's place?

12      A.   I had been up the street and I had bought

13  something to drink.  I had came down there -- can I

14  say this without getting in trouble?

15      Q.   You say whatever the truth is.

16      A.   -- to purchase drugs.  I was standing on the

17  sidewalk when the confusion went on.

18      Q.   Can you tell us where you were and what

19  position you were in and what you saw?

20      A.   I was standing on the sidewalk.  I started in

21  Herman's when I realized that there had been --

22  something was going on.  Then I heard someone say,

23  saying, saying something like:  I don't believe you'll

YVONNE DeSHEILDS - DIRECT

1    do it.

2         Q.   Was that a male voice or female voice?

3         A.   I don't know.  It sounded like female voices

4    to me.  Then I heard a shot, you know.

5         Q.   Where were you when you heard these voices

6    and a shot?

7         A.   Standing in front of the house, Herman Dark's

8    house.  Then I started on the porch.  That's when I

9    heard the shots and I got down on the porch.

10        Q.   When you heard the voices, did you look over

11   to where the voices were coming from?

12        A.   Yes.

13        Q.   Where were the voices coming from, where did

14   you look?

15        A.   Down the creek.

16        Q.   Did you look --

17        A.   In front of the bench.

18        Q.   Did you see any vehicle there at the entrance

19   way to Little Creek Apartments?

20        A.   A Blazer.

21        Q.   Was that all one color, two-tone, how would

22   you describe it?

23        A.   Two-tone:  Burgundy and gray.

DAVID WASHINGTON
Official Court Reporter

1    Q.    Had you ever seen that vehicle before?

2    A.    Yes, sir.

3    Q.    Had you seen that vehicle that night before?

4    A.    Yes, sir.

5    Q.    Where did you see that vehicle before you saw

6    it at the entrance way to Little Creek Apartments?

7    A.    He passed me on street by the graveyard.

8    Q.    And about how much before these noises that

9    you heard did this two-tone Blazer, as you call it,

10   pass you?

11   A.    20 minutes.

12   Q.    Had you ever seen that vehicle before that

13   night?

14   A.    Yes, sir.

15   Q.    All right.  For how long a period of time

16   before that night had you been seeing that vehicle in

17   the area of Little Creek Apartments?

18   A.    Excuse me?  I didn't understand what you

19   said.

20   Q.    Well, I'm not sure I know how else to phrase

21   it.  For how long a period of time, a few days, a

22   week, six months, how long had you been seeing that

23   vehicle?

DAVID WASHINGTON
Official Court Reporter

A-20
A-7

     A.   That vehicle, I seen it a week prior to this.

     Q.   A week or more?

3     A.   Yes.

4     Q.   And how many times a week?

5     A.   Once, sometimes twice.

6     Q.   Did you ever acknowledge the person who you

7  had see in that vehicle the times that you saw him in

8  the vehicle?

9     A.   Yes.

10     Q.   How?

11     A.   He wanted to buy drugs.

12     Q.   You don't understand what I mean.  Did you

13  ever wave to the person in that vehicle?

14     A.   He always spoke to me.

15     Q.   How did he speak to you?

16     A.   He always just threw his hands up.

17     Q.   What did you do?

18     A.   Speak back.

19     Q.   You said he was looking for drugs.  Do you

20  have any personal knowledge that the person in this

21  vehicle was looking for drugs?

22     A.   Yes.

23     Q.   All right.  How do you know that person was

DAVID WASHINGTON
Official Court Reporter

A-21

A-21    A-8

1    looking for drugs?

2         A.    He has asked me before.

3         Q.    Was this a male or female?

4         A.    Male.

5         Q.    White male, black male?

6         A.    White male.

7         Q.    Let's go back.  Are you uncomfortable at all?

8         A.    A little.

9         Q.    Just try to stay calm.  I want to take you

10   back to when you were on Muddy's porch, okay?

11        A.    Okay.

12        Q.    Now, what's the first thing that you hear?

13        A.    Voices.

14        Q.    As this is casual conversation, argument, how

15   would you characterize the voices?

16        A.    It was more like something was getting ready

17   to happen.  I heard this:  I don't believe you'll do

18   it or --

19        Q.    Did you look over there when you heard that?

20        A.    Yes.

21        Q.    Did you see the vehicle that you have been

22   talking about?

23        A.    Yes.

DAVID WASHINGTON
Official Court Reporter

A-9

YVONNE DeSHEILDS - DIRECT

1       Q.    Where was that vehicle?

2       A.    Coming up -- well, it was sitting still in

3    the front, coming up out of the entrance of Little

4    Creek.

5       Q.    Sitting still at the entrance of Little

6    Creek?

7       A.    Yes.

8       Q.    Was there anybody you recognized over there

9    by that vehicle, by the vehicle on the outside of the

10   vehicle?

11      A.    Ralph.

12      Q.    Ms. DeShields, you need to say the name and

13   say it loud?

14      A.    Ralph Reed.

15      Q.    And what did you see Ralph Reed doing at the

16   Bronco II?

17      A.    He was pointing a gun.

18      Q.    What did you hear or see next?

19      A.    Two ladies sitting on the bench, another guy

20   standing up.

21      Q.    Do you know the names of those people or

22   their nicknames?

23      A.    Sarah is one of them.  I don't know the other

DAVID WASHINGTON
Official Court Reporter

A-10

YVONNE DeSHIELDS - DIRECT

1   the envelope.  I am going to take this out of the

2   paper bag.  I want you to look at that.

3          Have you ever seen this before?

4      A.   Yes.

5      Q.   Where did you see that?

6      A.   On the sidewalk on the curb.

7      Q.   On the sidewalk where?

8      A.   Where the shooting occurred.

9      Q.   Pardon me?

10     A.   Where the shooting occurred.

11     Q.   And did you pick it up?

12     A.   Yes.

13     Q.   And when was this, to the best of your

14   recollection, after the shooting?

15     A.   Something like a couple of days.

16     Q.   What did you do with it?

17     A.   I gave it to Mr. Stewart.

18     Q.   Who is Mr. Stewart?

19     A.   Larry Stewart, who owns the deli.

20     Q.   Why did you give it to him, do you recall?

21     A.   Excuse me?

22     Q.   Do you remember why you gave it to him?

23     A.   Because I didn't know -- I gave it to him.  I

DAVID WASHINGTON
Official Court Reporter

A-22

A-11

1    knew they had been down to the store looking for me.

2    Anyway, I just gave it to him.  He gave it to his

3    wife.

4          MR. ADKINS:  Excuse me a moment.

5          (Pause.)

6    BY MR. ADKINS:

7          Q.   Did you see Larry Stewart give it to his

8    wife, Dolla?

9          A.    No.  I gave it to Larry.  I did not see him

10   give it to his wife.  I did give the bullet to him.

11         MR. ADKINS:  Excuse me.

12         (Pause.)

13   BY MR. ADKINS:

14         Q.   That shell casing you just identified picking

15   up on the sidewalk --

16         A.   Yes.

17         Q.   -- does that look in the same condition as

18   when you picked it up off the sidewalk?

19         A.   As far as I know.

20         Q.   Did it look the same?

21         A.    I didn't know it was bent up like that.  I

22   didn't pay it that much attention.

23         Q.   Well, look at it again.  I mean, how many

DAVID WASHINGTON
Official Court Reporter

A-23

A-12

```
 1   shell casings have you ever picked up on the sidewalk?

 2        A.   How many?

 3        Q.   Have you ever picked up any shell casings on

 4   the sidewalk at Little Creek other than that one?

 5        A.   No.

 6        Q.   Does that look about the same as when you

 7   picked it up?

 8        A.   Yes.

 9             MR. ADKINS:  I have no further questions.

10             THE COURT:  Mr. Haller.

11             THE WITNESS:  Oh Lord Jesus.

12                   CROSS-EXAMINATION

13   BY MR. HALLER:

14        Q.   You talked to the police last week?

15        A.   Yes, sir.

16        Q.   And where did you do that?

17        A.   The Laurel Police Department.

18        Q.   And how long did you talk to them?

19        A.   I had an appointment for 1:00.  I was

20   there -- I got there quarter of.  And I got out of

21   there about 2:30.

22        Q.   So you talked to them for about an hour

23   and-a-half?
```

DAVID WASHINGTON
Official Court Reporter

A-24
A-13

- CROSS

```
 1        A.    I want -- I don't know if I drank that many
 2     that afternoon.
 3        Q.    Tell us how many you drank?
 4        A.    Maybe a couple.  I wasn't intoxicated,
 5     believe me.
 6        Q.    Now, that evening did you drink any more?
 7        A.    No, I had not.
 8        Q.    All right.  You were going down to the scene
 9     to get what?  Why did you go down to the scene?
10        A.    I had been down there to purchase drugs.
11        Q.    That day?
12        A.    That evening.  It was foggy.
13        Q:    Had you purchased any drugs that evening?
14        A.    Yes.
15        Q.    Did you use the drugs that evening?
16        A.    No, I didn't.  I didn't have a chance to.
17        Q.    What drugs was it that you purchased?
18        A.    Crack cocaine.
19        Q.    Did you go down there to get any food?
20        A.    No, I didn't.
21        Q.    Did you go down there to get a bottle?
22        A.    Get a who, what?
23        Q.    A bottle of liquor or vodka?
```

DAVID WASHINGTON
Official Court Reporter

A-26
A-25    A-14

1    A.    They cannot sell alcohol at the store, in the

2    deli.

3    Q.    Why were you going to Mr. Muddy's?

4    A.    I went over there to Muddy's because earlier

5    I had borrowed some money from Herman Dark and I did

6    go to pay him back that evening.

7    Q.    It was foggy that evening?

8    A.    Yeah.

9    Q.    Moderately foggy, very foggy, mildly foggy?

10   A.    The fog had lifted.

11   Q.    It lifted?

12   A.    Yes.

13   Q.    It wasn't foggy?

14   A.    It was foggy, but it had been lifting.

15   Q.    You say you saw Ralph that night?

16   A.    Yes.

17   Q.    There were three other people there?

18   A.    Yes.

19   Q.    Do you know who they were?

20   A.    Not the young lady.

21   Q.    You know one of them?

22   A.    Yes.

23   Q.    Do you know the other two?

DAVID WASHINGTON
Official Court Reporter

YVONNE DeSHIELDS - CROSS

1        A.    I know them by seeing them.  I know the Bacon

2   boy.

3        Q.    You are saying you could identify all three

4   of the others?

5        A.    Yes, I can.

6        Q.    How far were they from Ralph?

7        A.    As close as I am to him.

8        Q.    You are indicating the court reporter.  And

9   that would be maybe three or four feet?

10       A.    Yes.

11       Q.    Can you describe them for us?

12       A.    One called Sarah, she's about four something.

13   She wear her hair tapered cut.

14       Q.    Sarah?

15       A.    Yes.

16       Q.    She is a younger woman?

17       A.    She's a young lady.

18       Q.    And who else?

19       A.    The other young girl, I don't know her name.

20       Q.    What about -- there was a man?

21       A.    Bacon.

22       Q.    Can you describe the Bronco for us?

23       A.    Burgundy and I guess gray, some kind of gray

DAVID WASHINGTON
Official Court Reporter

1    in it.  Streaked.  It was burgundy with gray or it

2    looked like gray to me.

3        Q.   Was it clean or was it dirty?

4        A.   It was clean.

5        Q.   What kind of tags did it have on it?

6        A.   Maryland.

7        Q.   You indicated that you thought you heard

8    female voices?

9        A.   Yes.

10       Q.   And where did they come from?

11       A.   Over in the area where the Blazer was at.

12       Q.   Where the three people were?

13       A.   Four people, Ralph.

14       Q.   Was there anybody else around the corner?

15       A.   Not exactly standing where they were.

16       Q.   No, but standing at the corner?

17       A.   Not on the corner, no.

18       Q.   Standing by the deli?

19       A.   No, down in the creek, the Little Creek

20   Apartments.

21       Q.   While you were at Muddy's could you see other

22   people?

23       A.   Yes, there was other people out there.

DAVID WASHINGTON
Official Court Reporter

A-17

SARAH HANDY - DIRECT

1     night of Tuesday, November 23rd. Do you recall that

2     night at Little Creek Apartments?

3         A.   Yes.

4         Q.   Say between 10:00 o'clock and 11 o'clock at

5     night, where were you on that date?

6         A.   In my bedroom.

7         Q.   Do you have a first floor or second-floor

8     apartment?

9         A.   Second.

10       Q.   And what building is your apartment in?

11       A.   107.

12       Q.   That's the 100 Building?

13       A.   Yes.

14       Q.   That 100 Building faces right on Seventh

15     Street just across from Little Creek Deli?

16       A.   Yes.

17       Q.   And out of your bedroom window can you

18     clearly see the Little Creek Deli?

19       A.   Yes.

20       Q.   You can also clearly see the entrance way of

21     the Little Creek Apartments?

22       A.   Yes.

23       Q.   On that night at around that time, did you

DAVID WASHINGTON
Official Court Reporter

SARAH HANDY - DIRECT

1    hear anything unusual?

2         A.   Yes, I heard some girls fussing.   Then after

3    that, I heard some -- four shots.

4         Q.   When you heard some fussing, what did you do?

5         A.   I was looking out the window.

6         Q.   And you say you heard shots?

7         A.   Yes.

8         Q.   When did you hear the shots, before or after

9    the fussing?

10        A.   It was before.   It was right after there was

11   arguing.

12        Q.   You heard shots right after the arguing?

13        A.   Yes.

14        Q.   When you heard the shots, were you looking

15   out the window?

16        A.   Yes.

17        Q.   What did you see?

18        A.   I saw someone standing with a gun in their

19   hand and then the shots, they had went off.   But the

20   truck went on the side of the sidewalk.

21        Q.   You saw someone with a gun in their hand and

22   you saw shots go off; is that correct?

23        A.   Yes.

DAVID WASHINGTON
Official Court Reporter

A-19

1     Q.    Did you see any vehicle down there?

2     A.    There was a Bronco truck, I think it was.

3     Q.    What did you see that Bronco truck do?

4     A.    It was speeding out and it went on the

5     sidewalk.

6     Q.    Do you recall hearing any noise when it sped

7     off?

8     A.    Yes.

9     Q.    What did you hear?

10    A.    It was speeding trying to get away.

11    Q.    Now, that person that you saw with the gun

12    shooting at the Bronco, have you ever seen that person

13    before?

14    A.    Yes.

15    Q.    And if you saw that person again, do you

16    think you would recognize that person?

17    A.    Yes.

18    Q.    I want you to look around this courtroom and

19    see if you see that person?

20    A.    Right there. (Witness indicating.)

21          MR. ADKINS:  If the record would please

22    indicate that the witness has pointed at the

23    defendant.

DAVID WASHINGTON
Official Court Reporter

A-20

B-32
JUANITA HOPKINS - CROSS

1        THE COURT:  All right.  Mr. Haller.

2                    CROSS-EXAMINATION

3    BY MR. HALLER:

4        Q.   You realize you are under oath now, Ms.

5    Hopkins?

6        A.   Yes.

7        Q.   Going back to the night when you saw that man

8    in the street, was that Ralph?

9        A.   That's who I thought it was.  I mean, yes, it

10   was foggy and I wasn't sure.  I wasn't really sure,

11   but he fit the description.  It looked like the

12   height.

13       Q.   Well, is your answer: It wasn't Ralph, it

14   might have been Ralph or it was Ralph, what's your

15   answer today under oath looking back on who you saw

16   and what you learned that night?

17       A.   I mean, I don't know how I'm supposed to say

18   yes to it, you know?

19       Q.   You are not sure it wasn't Ralph that you saw

20   that night?

21       A.   I'm almost certain, yes, but there is just

22   that little bit of doubt that, no, I'm not sure.

23       Q.   Okay.

DAVID WASHINGTON
Official Court Reporter

A-221

RESHAWN JEFFERSON - CROSS

1          (Whereupon, the jury returned to the
2      courtroom.)
3          THE COURT:  Mr. Haller.
4          MR. HALLER:  Thank you.
5                    CROSS-EXAMINATION
6    BY MR. HALLER:
7      Q.   On November 23rd when you were driving by the
8    apartments, you looked and saw the Bronco?
9      A.   Yes.
10     Q.   Who was the closest person to the Bronco?
11     A.   Ralph.
12     Q.   And he was within touching distance of the
13   Bronco, he could touch it?
14     A.   Like one to two feet, yeah.
15     Q.   Who were the two next closest people to the
16   Bronco?
17     A.   I don't know.
18     Q.   Well, was there anybody within five feet of
19   the Bronco?
20     A.   I don't know who they were.  I can't say.  It
21   was too foggy.  There was quite a few people outside.
22     Q.   So there could have been other people, say,
23   within five feet of the Bronco?

1      Q.    You don't know any of them, who they were?

2      A.    No.

3      Q.    Weren't there two girls and a guy close to

4    Ralph?

5      A.    Excuse me?

6      Q.    Weren't there two girls and a guy close to

7    Ralph?

8      A.    I don't know.

9      Q.    You don't know?

10     A.    No.

11     Q.    Do you know who the triplets are?

12     A.    I heard of them.  I don't know their names.

13     Q.    Did you see any of them that night out there?

14     A.    No.

15     Q.    Do you know if you saw Ralph with the gun

16   that night?

17     A.    I didn't see no gun.

18     Q.    Did you ever see Ralph with a gun?

19     A.    No.

20     Q.    Did you go to the police or did the police

21   come to you?

22     A.    The police came to me.

23     Q.    When did they do that?

DAVID WASHINGTON
Official Court Reporter

A-23

everything he had on was black.

2        Q.   Did she describe Ralph Reed?

3        A.   Yes, she described him as being a tall, slim

4    black male.

5        Q.   Do you recall the interview that you

6    conducted last week at Laurel Police Department with

7    Ms. Kiesha Dixon?

8        A.   Yes, ma'am.

9        Q.   Do you remember asking her similar questions

10   as to what Ralph looks like and what he was wearing on

11   November 23rd?

12       A.   Yes.

13       Q.   Do you recall what her answer was last week?

14       A.   Basically the same. She said it was foggy

15   that night. She couldn't exactly recall because it

16   had been a few months earlier.

17            MS. TSANTES: Thank you, Detective. I have

18   no further questions.

19            THE COURT: Mr. Haller?

20            MR. HALLER: No questions.

21            THE COURT: You may step down.

22                              (Witness steps down.)

23            THE COURT: Sidebar, 3507.

DAVID WASHINGTON
Official Court Reporter

A-24

    1   was called as a witness by and on behalf of the State

    2   of Delaware and, having been first duly sworn, was

    3   examined and testified as follows:

    4                    DIRECT EXAMINATION

    5   BY MS TSANTES:

    6       Q.   Good afternoon, Ms. West.

    7       A.   Hi.

    8       Q.   Your friends call you something other than

    9   Sharnelle?

   10       A.   Dutch.

   11       Q.  . Do you know Mashika Williams?

   12       A.'  Yes.

   13       Q.   How do you know Mashika?

   14       A.   She's my best friend.

   15       Q.   What do you call her?

   16       A.   Sheik.

   17       Q.   Do you also know Daren Bacon?

   18       A.   Yes.

   19       Q.   How long have you known Daren?

   20       A.   For about two or three years.

   21       Q.   Do you also know Ralph Reed?

   22       A.   Yes.

   23       Q.   How do you know Ralph?

                    DAVID WASHINGTON
                 Official Court Reporter


A-25

1     A.    He's friends with my cousin, Kenyon.

2     Q.    How long have you known Ralph Reed?

3     A.    About a year.

4     Q.    Are you social with him?

5     A.    Yes.

6     Q.    Hang out with him?

7     A.    Yes.

8     Q.    Where do you live?

9     A.    122 Tull Drive, Seaford, Delaware.

10    Q.    Back in November of 1999, where were you

11   living?

12    A.    611 Little Creek Drive.

13    Q.    In Little Creek Apartments?

14    A.    Yes.

15    Q.    Back on November 23rd, 1999, did you meet up

16   with Sheik after she got off of work at Little Creek

17   Apartments?

18    A.    Yes.

19    Q.    Were you hanging out with her?

20    A.    Yes.

21    Q.    At some point later in the evening did you

22   meet up with your friend, Daren, and with Ralph?

23    A.    Yes.

DAVID WASHINGTON
Official Court Reporter



A-26

1       Q.    Where did you meet them?

2       A.    They were out in Little Creek.

3       Q.    Where did you see them?

4       A.    Probably near the 300 Building.  I'm not

5    sure.

6       Q.    At some point were you hanging near the

7    Little Creek Deli or at the entrance way of the Little

8    Creek Apartments with Sheik, Daren and with Ralph?

9       A.    Yes.

10      Q.    Where in that entrance way were you hanging

11   out?

12      A.    At first we were near the bench.

13      Q.    By bench, can you describe for the jury where

14   you mean?

15      A.    The bench in front of the mailboxes.

16      Q.    Is that right by the 100 Building or the 200

17   Building?

18      A.    The bench is by the 300 Building.

19      Q.    And at some point later did you move from the

20   300 Building and go closer up to the entrance way?

21      A.    Yes, we were at the green box.

22      Q.    Outside of which apartment is the green box?

23      A.    It's like between the 100 and 200 Building,

DAVID WASHINGTON
Official Court Reporter



A-27

1    more behind the 200 Building.

2        Q.   And when you say behind, do you mean on the

3    street side in terms of Seventh Street or do you mean

4    the parking lot?

5        A.   The street side.

6             MS TSANTES:   May I have State's Exhibit No.

7    3.

8    BY MS TSANTES:

9        Q.   State's Exhibit 3 shows a green box there.

10   It is circled.  Is that the green box that you were

11   hanging out by?

12       A.   Yeah.

13       Q.   And who was with you when you were on the

14   green box?

15       A.   Sheik and Daren.

16       Q.   Where was Ralph?

17       A.   He was like at the corner of the apartments.

18       Q.   Did you see Ralph doing anything at the

19   corner of the apartments?

20       A.   No.  Not really, no.

21       Q.   Was Ralph by himself or was he standing in

22   one place at the corner of the apartments?

23       A.   Excuse me?

DAVID WASHINGTON
Official Court Reporter

 A-28

1    Q.    What was Ralph doing by the corner of the

2    apartments?

3    A.    Just standing there.

4    Q.    Did you see him talking to anybody?

5    A.    When do you mean?

6    Q.    Okay.  Let me back up a little bit and give

7    you a time frame.  When you were on the green box with

8    Daren and Sheik, was Ms. Dolla's door or doors still

9    open?

10   A.    Yeah.  I think she was getting ready to

11   close.  •

12   Q.`   Do you know what her regular closing time was

13   back in November?

14   A.    It may have been eleven.

15   Q.    Could it have been ten?

16   A.    Ten or eleven.

17   Q.    Who else was outside in that area?  You said

18   Ralph was by the entrance way at that time?

19   A.    Yes.

20   Q.    Who else did you see outside?

21   A.    Reshawn.  I don't know.  Someone was on the

22   phone.

23   Q.    Do you know who that person was?

DAVID WASHINGTON
Official Court Reporter

 A-29

SHARNELLE L. WEST - DIRECT

1         A.    No.   It was a girl.

2         Q.    Did you get anything to eat that night?

3         A.    I didn't, no.

4         Q.    Did you see Ralph or Daren get something to

5    eat that night?

6         A.    Yes.

7         Q.    Was it before or after the store closed?

8         A.    After.   It was like during the time she was

9    closing.

10        Q.    During closing time?

11        A. . Yes.

12        Q.'   Where did you see Ralph and Daren eat what

13   they got?

14        A.    Just right outside, like between the fence

15   and Dolla's parking lot.

16        Q.    What were you doing, what were you and Sheik

17   doing when Daren and Ralph were getting some food?

18        A.    I don't know.   We were just standing outside,

19   just standing around.

20        Q.    Other than seeing Ralph get something to eat

21   at Ms. Dolla's store around closing time, did you see

22   Ralph doing anything?

23        A.    He was -- I don't know, playing with a pole.

DAVID WASHINGTON
Official Court Reporter

 A-30

SHARNELLE L. WEST - DIRECT

1       Q.   Do you remember Ralph going up to any cars

2    that night?

3       A.   Yes.

4       Q.   How many cars did you see Ralph go up to that

5    night?

6       A.   Like one or two.

7       Q.   Do you remember what any of those cars looked

8    like?

9       A.   I remember a white pickup, maybe, and like a

10   red and white truck.

11      Q.   What would you see Ralph do when he would go

12   up to these cars?

13      A.   I wasn't watching him like that.

14      Q.   You saw him go up to at least two cars that

15   evening?

16      A.   Yes.

17      Q.   This was before you heard any gunshots?

18      A.   Yes.

19      Q.   At some point did you hear gunshots?

20      A.   Yes.

21      Q.   Where were you when you heard those gunshots?

22      A.   At the green box.  I wasn't sitting on the

23   green box, but I was standing like a couple feet in

DAVID WASHINGTON
Official Court Reporter


A-31

B-167
SHARNELLE L. WEST - DIRECT

1   front of it.

2       Q.   And where was Daren?

3       A.   He was sitting on the green box.

4       Q.   Was anybody else sitting on the green box?

5       A.   Sheik.

6       Q.   Was Ralph sitting on the green box?

7       A.   No.

8       Q.   Where was Ralph?

9       A.   At the stop sign.

10      Q.   Did you see Ralph up near anything at the

11   stop sign?

12      A.   Yes.

13      Q.   What was he near?

14      A.   The red and white truck.

15      Q.   Could you tell who was in the red and white

16   truck?

17      A.   No.

18      Q.   Where was Ralph and how far away from the red

19   and white truck was Ralph when you heard the shots?

20      A.   When I heard the shots, I went around in

21   front of the building, between the two buildings.

22   When I heard the tire squeal and everything, he was at

23   the sidewalk still at the stop sign.

DAVID WASHINGTON
Official Court Reporter



Q. Was there anybody else near him at that point?

A. I can't recall.

Q. Did you see anybody else?

A. No.

Q. Let me ask you this: Do you know Kenyon Horsey?

A. Yes.

Q. Did you see Kenyon there at the entrance way?

A. No.

Q. Did you hear the shots first or the tires squealing, do you remember?

A. I'm not sure.

Q. How many shots did you hear?

A. About four, four or five.

Q. What kind of noises did you hear coming from the car?

A. The tires squealing.

Q. Did you see which way the car was going?

A. No. As soon as we heard the shots and the tires squealing, we ran around, you know, between the two buildings. So I didn't see which direction the car went.

1    Q.    And when you say "we ran around", who did you
2    run with?

3    A.    Sheik and Daren.

4    Q.    Did you see Ralph after you heard the shots?

5    A.    You mean right away or later on?

6    Q.    Let's talk about both.  Did you see Ralph
7    right away when you heard the shots?

8    A.    No.

9    Q.    How about afterwards, did you see him?

10    A.    Yes.

11    Q. . Where did you see him?

12    A.'   At the 600 Building.

13    Q.    Between hearing the shots and seeing him at
14    the 600 Building, had you seen him anywhere else?

15    A.    No.

16    Q.    What did Ralph look like when you saw him by
17    the 600 building?

18    A.    He just, like, had a -- I don't know.  A
19    puzzled look on his face maybe.

20    Q.    Did he look different than normal?

21    A.    He just looked puzzled.  I mean, I guess
22    that's different from normal.

23    Q.    Do you remember what Ralph was wearing?

DAVID WASHINGTON
Official Court Reporter



1      A.   A black jacket.

2      Q.   Do you remember if the black jacket had a

3   hood?

4      A.   It had a hood.

5      Q.   When you saw Ralph up at the 600 Building was

6   he inside or outside?

7      A.   He was inside my apartment.

8      Q.   Whose apartment?

9      A.   My apartment.

10     Q.   How did Ralph get inside of your apartment?

11     A.   The door was unlocked.

12     Q.   Had Ralph ever been in your apartment before?

13     A.   Yes.

14     Q.   Where was Ralph inside of your apartment when

15   you came in?

16     A.   He was coming down the hallway.

17     Q.   Where was he coming from?

18     A.   I suppose my bedroom.  In that apartment the

19   bathroom is in the bedroom.  So the bathroom is in the

20   bedroom.

21     Q.   The bedroom/bathroom, same area?

22     A.   Right in the same spot.

23     Q.   Was he with anybody?

DAVID WASHINGTON
Official Court Reporter



1        A.    No.

2        Q.    Did you and Ralph have a conversation?

3        A.    It wasn't a conversation.  I just told him,

4   you know, that he had to leave.  I was about to leave

5   and lock my door and that someone hit a house down the

6   street.  I was going to lock my door.

7        Q.    Did Ralph leave your apartment?

8        A.    Yes.

9        Q.    Did you see him leave with anyone?

10       A.    No.

11       Q.  · Was he inside of your apartment -- when you

12   walked' in your apartment, was anyone other than Ralph

13   in your apartment?

14       A.    No.  My sister was there, but she was

15   sleeping.

16       Q.    Were you with anyone or by yourself when you

17   went back to your apartment?

18       A.    I was by myself.

19       Q.    When Ralph went to leave your apartment, was

20   there anybody in your entrance way?

21       A.    I think Daren may have been standing in the

22   building.

23       Q.    Was anyone else there?

DAVID WASHINGTON
Official Court Reporter

 A-36

1        A.    I can't recall.

2        Q.    What happened to your friend, Sheik, at that
3    point? Was she with you?

4        A.    She was still out, you know, where the crowd
5    of people was.

6        Q.    Did Ralph leave your apartment when you asked
7    him to?

8        A.    Yes.

9        Q.    Did you leave your apartment?

10       A.    Yeah.

11       Q.    Did you leave with anyone?

12       A.    No.

13       Q.    Where did you go when you left your
14    apartment?

15       A.    I went to Sharmelle's house.

16       Q.    Where is that?

17       A.    The 30^ Building.

18       Q.    Why were you going over to Sharmelle's house?

19       A.    I left my purse there.

20       Q.    Did you go get your purse from that person's
21    apartment?

22       A.    Yes.

23       Q.    What did you do after that?

DAVID WASHINGTON
Official Court Reporter



SHARNELLE L. WEST - DIRECT

1      A.    I got my purse and I called Gailyn to see if

2    she was picking me up.

3      Q.    Who is Gailyn?

4      A.    She is Kenyon's girlfriend.

5      Q.    Where does Gailyn live?

6      A.    At the time she lived in Seaford.

7      Q.    You had a conversation with Gailyn.  Without

8    getting into what Gailyn said to you, did you make

9    arrangements to stay at Gailyn's place that evening?

10      A.    Those arrangements were already made.

11      Q.    Did she come and pick you up?

12      A.    No.

13      Q.    How did you get to Gailyn's apartment?

14      A.    Kenyon.

15      Q.    You said that Kenyon was not in the entrance

16    way at Little Creek Apartments when the shots went

17    off.  Where did you find Kenyon that night?

18      A.    He was at his grandmother's on Center Street.

19      Q.    How did you get to his grandmother's house on

20    Center Street?

21      A.    I walked.

22      Q.    Were you by yourself of did someone walk with

23    you?

DAVID WASHINGTON
Official Court Reporter



A-38

SHARNELLE L. WEST - DIRECT

1      A.    Someone walked with me.

2      Q.    Who walked you over there?

3      A.    Jr.

4      Q.    Do you recall how you got from the 600

5   Building over to Center Street?

6      A.    Walked.

7      Q.    Can you give me some directions in terms of

8   which direction?  Tell me which direction you traveled

9   to get to Center Street?

10      A.    I walked down the sidewalk in front of the

11   200 Building and a 100 Building, I believe.  Jr. may

12   have been standing at the 100 Building then and asked

13   me if he -- if I wanted him to walk me around there.

14   I said, yes, and we went around on to Center Street.

15      Q.    Did you see anybody when you were walking

16   towards Center Street?

17      A.    No.

18      Q.    Did you see anybody once you got on Center

19   Street?

20      A.    I saw Pie and Kenyon.

21      Q.    Pie, does he have another name other than

22   that nickname?

23      A.    Pie is the nickname.

DAVID WASHINGTON
Official Court Reporter

 A-39

 1      Q.    Do you know his real name?

 2      A.    I think it's Oscar.

 3      Q.    You saw Kenyon?

 4      A.    Yeah.

 5      Q.    Did you see anyone else?

 6      A.    No.

 7      Q.    Did you see Ralph at all after you saw him

 8   leave your apartment?

 9      A.    No.

10      Q.    Did you see him on Center Street afterwards?

11      A.    No.

12      Q.    Ms. West; do you remember talking to the

13   Delaware State Police back in November, on

14   November 26, 1999, had an interview which took place

15   at the Delaware State Police Troop No. 5?

16      A.    Yes.

17      Q.    Did you speak with Detective Fraley back in

18   November of 1999?

19      A.    Yes.

20      Q.    Did you speak with him voluntarily?

21      A.    Yes.

22      Q.    Did you tell him the truth?

23      A.    Yes.

DAVID WASHINGTON
Official Court Reporter



1       Q.    What did you tell him that day?

2       A.    I told --

3       Q.    Did he ask you questions about what happened

4    that night?

5       A.    Yes.

6       Q.    What did you tell him?

7       A.    I told him where I was, what happened, what I

8    did, and that's it.

9       Q.    Do you remember coming to the Laurel Police

10   Department last week and speaking with Detective

11   Fraley again at the Laurel Police Department with

12   Mr. Adkins and myself?

13      A.    Yes.

14      Q.    Did you speak to us voluntarily?

15      A.    Yeah.

16      Q.    And did you tell us the truth?

17      A.    Yes.

18      Q.    Do you recall what you said on that day?

19      A.    Yeah.

20      Q.    Just in a nutshell, what did we talk about

21   that day?

22      A.    We talked about Ralph being at Little Creek

23   and what he did and where was Sheik, was where Daren.



1   It was the same thing we talked about at the police
2   barracks.

3        Q.   When those shots were fired you were standing
4   next to the green box?

5        A.   I was standing in front, in front of the
6   green box.

7        Q.   You say in front.  You are talking about the
8   Seventh Street side or the apartment side, by the
9   street or by the apartment or by the entrance way to
10  Little Creek, where?  Do you want the pictures to show
11  us?

12       A.   This is like the green box.  I'm standing
13  right in front of the green box.

14       Q.   Are you closest to the street at that point
15  or are you closer to the entrance way to Little Creek
16  Apartments?

17       A.   Closer to the street.  My back is to the
18  entrance.

19       Q.   So your back is to the entrance?

20       A.   Yes.

21       Q.   What do you do when you hear the shots and
22  the squealing tires?

23       A.   When we heard the squealing tires, I turned



A-442

1    and went in between the 100 and 200 building because

2    people were running from like the 100 Building.  You

3    were not going in front of the 200 Building.

4         Q.    Which way were the shots coming from?

5         A.    Behind me.

6         Q.    So, in other words, from the entrance way at

7    Little Creek Apartments?

8         A.    Yes.

9         Q.    Where you saw Ralph standing next to that

10   car?

11        A.    Yes.

12        Q.    Didn't you look when you heard the shots to

13   see what was going on?

14        A.    No.

15        Q.    Why didn't you look?

16        A.    I didn't want to, I guess.

17        Q.    Didn't you see who shot that man, Ms. West?

18        A.    No, I did not.

19        Q.    I want to take you back to the conversation,

20   the short discussion you had with Ralph when you found

21   him at your apartment after the shooting, okay?

22        A.    Yes.

23        Q.    Did you tell Ralph something had happened



SHARNELLE L. WEST - DIRECT

1    girlfriend's house and were upset, upset that you saw

2    Ralph Reed kill that man?  That's why --

3        A.    No.

4        Q.    Weren't you upset when you got to the

5    girlfriend's house?

6        A.    Yes.

7        Q.    Weren't you upset because Ralph Reed shot

8    that man?

9        A.    I didn't see him shoot the man.  I can't say

10   that.

11       Q:    Didn't you tell Kenyon he shot that man?

12       A.    No, because I didn't see him shoot him.

13       Q.    You knew he shot him, didn't you?

14       A.    I mean,m that's what was said.

15             MR. HALLER:  Your Honor, I object.

16             THE COURT:  Sustain.  The last question and

17   answer are stricken.

18   BY MS TSANTES:

19       Q.    What did you and Kenyon talk about on the

20   ride to your girlfriend's house?

21       A.    He said someone had been shot and ran into a

22   house.  I said I heard the same thing, I was outside.

23   That's it.  We talked about other things.

DAVID WASHINGTON
Official Court Reporter

A-46

1      Q.    Were you upset while you were on the car ride
2    home?

3      A.    Not real upset, no.

4      Q.    How about once you got to your girlfriend's
5    house?

6      A.    No.

7      Q.    You weren't upset at all?

8      A.    No.  I went to bed.

9      Q.    Did you stay up and talk to your girlfriend
10   at all?

11     A. •  No, I didn't go there to talk, really.  We
12   were supposed to go shopping the next day.  That's
13   what I went there for.

14     Q.    It's your sworn testimony that when you got
15   to your girlfriend's house you didn't talk to her
16   about seeing the man get shot and saying Ralph did it?

17     A.    No, because I didn't see that.

18          MS TSANTES:  Nothing further.

19          THE COURT:  We are going to take a recess
20   right now.

21          MR. ADKINS:  Can we talk about scheduling?

22          THE COURT:  We are not breaking for today.  I
23   will let the jury get started.  The jury can go in.

DAVID WASHINGTON
Official Court Reporter



SHARNELLE L. WEST - DIRECT

1            (Whereupon, the jury left the courtroom.)

2        .    THE COURT:  I will see you all about

3    scheduling here at the sidebar.

4            (Whereupon, counsel approached the bench and

5        a discussion took place off the record.  After

6        which, counsel returned to the trial table and

7        the following proceedings were had:)

8            THE COURT:  We will take a recess.

9            (Whereupon, Court stood in recess and brief

10       recess was taken.)

11        .   THE COURT:  Okay.

12            MS TSANTES:  I have a couple more questions.

13            THE COURT:  Okay.  All right.

14            Bring the jury in.

15            (Whereupon, the jury returned to the

16    courtroom.)

17            THE COURT:  All right.  You may proceed.

18    BY MS TSANTES:

19        Q.   Ms. West, I have a couple more questions.

20    After the shooting, didn't you see Ralph going up

21    towards Center Street after he left your apartment?

22        A.   No, because I was still at Little Creek for a

23    couple of minutes after I told him to leave.  I didn't

DAVID WASHINGTON
Official Court Reporter



1    see him going anywhere, no.

2         Q.    Didn't you tell Kenyon Horsey over and over

3    again:  I can't believe he did it; I don't believe he

4    did it; he shot that man; Ralph shot that man, didn't

5    you tell him that?

6         A.    No, I did not.

7              MS TSANTES:  I have nothing further.

8              MR. HALLER:  We need to approach.

9              THE COURT:  All right.

10             (Whereupon, counsel approached the bench and

11         the following proceedings were had:)

12             MR. HALLER:  Okay, we have the criminal

13    record of Sharnelle West.  She is on probation to Drug

14    Court, it appears.  And my theory here, of course, is

15    that the arm of the law, you were assisted by the

16    prosecution's office pursuing VOPs, violations.  They

17    handle probation violations and the prosecutors, that

18    gives them leverage over her.  I intend to ask her.

19             THE COURT:  I don't know what that is.  I

20    wouldn't want that --

21             Madam Clerk, we need to call down and have

22    somebody pull -- if we have a file here -- on a

23    Sharnelle L. West.

DAVID WASHINGTON
Official Court Reporter

 A-49

1           THE CLERK:  Yes.

2           THE COURT:  On Sharnelle L. West.  I need to

3   potentially get her file and her Drug Court file,

4   okay?  If this is diversion -- she may just be in

5   diversion.

6           MS TSANTES:  That's what she told us in the

7   interview.

8           THE COURT:  She is in diversion, not

9   convicted.

10          MR. HALLER:  She has to report.

11          .  THE COURT:  To me.  She is not in control of

12  the prosecutor.  She reports to me.  She is at the

13  mercy of the Court as to whether or not she can be

14  terminated from the program and whether or not she

15  would be adjudicated guilty.  She has been charged.

16  She has not been convicted of anything if she is just

17  in the diversion.

18          MR. HALLER:  The prosecution never gets

19  involved in cases with the Drug Court?

20          THE COURT:  The prosecution makes a decision

21  as to whether or not she goes into Drug Court or not.

22  When she enters, that is totally up to the Court.  Is

23  this somebody that you really want to impeach?  Strike

DAVID WASHINGTON
Official Court Reporter



1    that.

2            MR. HALLER:  The answer to that --

3            THE COURT:  Don't strike that.

4            MR. HALLER:  I didn't mean to throw you a

5    screwball.  I do want to make -- raise the legal

6    questions that are proper to be raised here.  And this

7    is one, it's a little different.  I mean, every time I

8    come up with a record there is something with a twist

9    on it.

10            THE COURT:  We will let you go there if the

11   record from the Prothonotary's Office supports being

12   able to go there, okay?

13            MS TSANTES:  She acknowledged she was in Drug

14   Court.

15            THE COURT:  What I want to find out is where

16   she is.  I will let you go there:  If you are in the

17   program; have you been charged and you are in the

18   program -- you can go there -- as to whether the

19   prosecutor made a decision to let you go into the

20   program.  They can ask:  Have your been convicted of

21   anything, or anything of that nature.  If you put it

22   in front of the jury, we will let the jury have the

23   whole thing.

                    DAVID WASHINGTON
                  Official Court Reporter

A- 51

1          MR. ADKINS:  I think he can go ahead and
2     point out she's in Drug Court.
3          MR. HALLER:  Yeah.
4          THE COURT:  You begin your cross-examination
5     while that file is being pursued?
6          MR. HALLER:  Yeah, but I'm not going to be
7     very long.
8          THE COURT:  We will do our best then.  Thank
9     you.
10                    CROSS-EXAMINATION
11    BY MR. HALLER:
12         Q.  So you were sitting right around the green
13    box when the shooting occurred?
14         A.  Yes.
15         Q.  That's maybe 100 feet?
16         A.  I don't -- 100 feet what?
17         Q.  From the box to where the entrance to Little
18    Creek is?
19         A.  I don't know how far it is.
20         Q.  And you didn't see Ralph Reed shoot anybody?
21         A.  No.
22         Q.  And then later Ralph was in your apartment?
23         A.  Yes.

DAVID WASHINGTON
Official Court Reporter



1       Q.   And I take it that he -- or you inferred that
2   he was going there to use the bathroom?
3       A.   Yes, that's the way I took it.   What else
4   would he go there for?
5       Q.   Had he done that before with your apartment?
6       A.   Yes, he's been there with Kenyon before.
7       Q.   How many times has he used the bathroom
8   before in your apartment?
9       A.   I don't know.
10      Q.   A few times, many times, only that once?
11      A.   I don't know.
12      Q.   Were you upset that he had went into your
13  apartment like that?
14      A.   No.  I mean, he's not the only one that used
15  my bathroom, just went in and used the bathroom.
16      Q.   You indicated that he talked to people in the
17  one or two weeks vehicles that came up that night?
18      A.   Yes.
19      Q.   And did you recognize the people that were
20  driving the vehicles?
21      A.   No.
22      Q.   Do you know whether or not they were just
23  friends over that he was chatting with or not?

DAVID WASHINGTON
Official Court Reporter



1       A.    They may have been.  You know, they may have

2    been.

3       Q.    One vehicle you mentioned was a white pickup

4    truck?

5       A.    Yes.

6       Q.    Describe the other vehicle?

7       A.    It was a red and white truck.

8       Q.    What sort of truck?

9       A.    It wasn't an open-back truck.

10      Q.    Was it actually a truck or was it a sport

11   utility vehicle?

12      A.    It wasn't a pickup.  I guess a sports utility

13   vehicle.  It wasn't a pickup truck.

14      Q.    Okay.  Do you remember what tags it had?

15      A.    Oh, no.  No.

16            MR. HALLER:  All right.

17            Your Honor?

18            THE COURT:  All right.  You can come to the

19   sidebar.

20            (Whereupon, counsel approached the bench and

21       the following proceedings were had:)

22            MR. HALLER:  I am going to tell you right

23   now, regardless of your ruling, I'm going to go ahead

DAVID WASHINGTON
Official Court Reporter

A-54

1    and impeach.  So perhaps you don't even want to make
2    the ruling.

3         THE COURT:  I am going to follow-up.  January
4    the 28th she went into the Drug Court Diversion
5    Program on apparently a marijuana charge.  She is in
6    the Drug Court Program on those charges.  The
7    prosecutor makes the decision whether she goes and I
8    make the decision.  She is not doing very well.  In
9    fact, I will probably see her later this month.
10   Hopefully she will be doing better then.

11        If you want the go into that, you can.
12        MR. HALLER:  Well, I don't want to go into
13   it.

14        THE COURT:  All right.  I have another
15   question:  If you have 3507, you haven't touched on a
16   lot of things.  You are not --

17        MS TSANTES:  No.

18        THE COURT:  Fine.  If you bring Kenyon in,
19   it's only for impeachment purposes.  Then we have to
20   distinguish between impeachment and 3507.

21        MR. ADKINS:  We will have Kenyon here
22   probably tomorrow and we intend to address the
23   conversations in the vehicle.

DAVID WASHINGTON
Official Court Reporter

1              THE COURT:  Well, I understand that.  And I

2     think you ought -- we ought to have this young lady

3     here tomorrow.

4              MR. ADKINS:  Absolutely.

5              THE COURT:  So we can decide what issues we

6     may have or may not have at that time.  Because that

7     may very well be for impeachment only.  I have to

8     restrict it to impeachment.

9              (Whereupon, counsel returned to the trial

10         table and the following proceedings were had:)

11             THE COURT:  Okay, any more redirect?

12             MS TSANTES:  Yes.

13             THE COURT:  Okay.

14                    REDIRECT EXAMINATION

15    BY MS TSANTES:

16        Q.   Ms. West, Mr. Haller just asked you some

17    questions about Ralph going into your apartment at

18    times when you were there and when you were not there;

19    do you remember those questions?

20        A.   Yes.

21        Q.   And you told the jury that he would go from

22    time to time to your apartment to use the bathroom

23    whether or not you were there; is that right?

                        DAVID WASHINGTON
                     Official Court Reporter

 A-56

1       A.    I said he would go there with Kenyon from

2    time to time.

3       Q.    But he has been in your apartment before?

4       A.    Yes.

5       Q.    You always felt comfortable with him in your

6    apartment before?

7       A.    I mean, yeah.   It wasn't a big deal.   He

8    wasn't the only person that was in or out of my

9    apartment.

10      Q.    Well, if he was such a good friend that he

11   was able to come and go in your apartment, why, on

12   November 23rd, 1999, did you ask him to leave the

13   apartment after those shots were fired?

14      A.    Because I wasn't going to be home for the

15   rest of that night and I wanted to lock my door.

16      Q.    Isn't the reason you ordered him out because

17   you had just seen him kill that man?

18      A.    No.

19            MR. HALLER:   I object.   This is her witness.

20            THE COURT:   Overruled.   All right.   Are we

21   done for right now?

22            MR. HALLER:   We are done for right now.

23            THE COURT:   Ma'am, you are still on the

DAVID WASHINGTON
Official Court Reporter

 A-57

arnelle West.

        MR. ADKINS:  Actually, I'll call Sharnelle
West for cross-examination purposes for Mr. Haller.

        THE COURT:  Is she here now?

        MR. ADKINS:  Yes.

        THE COURT:  May it please you both.  This is
actually typical in these types of cases for these
things to happen.  It is probably why we get
frustrated with the time.

                SHARNELLE L. WEST

was called as a witness by and on behalf of the State
of Delaware and, having been previously duly sworn, was
examined further and testified as follows:

                CROSS-EXAMINATION

BY MR. HALLER:

        Q.    Good morning.

        A.    Good morning.

        Q.    Let's go back to November 23rd, the day of
the incident.  Are you with me?

        A.    Yes.

        Q.    You were on the green box?

        A.    Yes.

        Q.    You heard shots?

                DAVID WASHINGTON
                Official Court Reporter

  

SHARNELLE L. WEST - RECROSS

A.    Yes.

Q.    Later on in the evening you met up with Kenyon Horsey?

A.    Yes.

Q.    What did you tell Kenyon Horsey about the shooting?

A.    That someone had been shoot, shot and hit a house.

Q.    Did you tell him any particular person had done the shooting?

A.    Yes.

Q.    Who was that?

A.    I said Ralph.

Q.    Why did you say Ralph?

A.    Because that's what they were saying out at Little Creek, that Ralph did it.

Q.    Is this something you had heard?

A.    Yes.

Q.    Can you give us an idea as to what time you met up with Kenyon Horsey and where?

A.    At his grandmother's on Center Street.  I'm not sure what time it was.

Q.    Can you give us some idea how many minutes

DAVID WASHINGTON
Official Court Reporter

A-127

KENYON HORSEY - Direct

A    Me and Oscar Johnson was sitting on my car
in front of my grandmom's and we heard like some
brakes squealing, then we heard gunshots at the same
4    time.  We were like -- we heard gunshots.

5    Q    About how many gunshots did you hear?

6    A    Like four.  There were four or five.

7    Q    What's the next thing that you saw?

8    A    Then we seen a lady named Ms. Yvonne coming

9    across the field where we was sitting at on my car,

10    hollering about, "That boy done shot somebody, that

11    boy done shot somebody."

12    Q    Did she seem calm or upset?

13    A    She was upset.

14    Q    And where did she go?

15    A    She just stood in the field, just kept

16    saying it over and over.

17    Q    All right.  Did you see anybody after you

18    saw Ms. Yvonne?

19    A    About like ten minutes later, I seen Ralph

20    coming from around the hill from like Little Creek

21    direction.

22    Q    Coming around the what?

23    A    The hill, from like towards Little Creek

direction. It's like ten minutes after I heard the

2    shots and Ms. Yvonne got up there.

3        Q    All right. Did you see anybody else?

4        A    Like five minutes later, Sharnelle came

5    from behind the same way Ralph came.

6        Q    Does she have a nickname?

7        A    Dutch.

8        Q    Did you say anything to Ralph at that point

9    or did he say anything to you?

10       A    Me and Pie said at the same time about,

11   "Man, you've been shooting, weren't you?" And he

12   was like, "No, no, unh-unh, it wasn't me."

13       Q    And how about Dutch, did you happen to make

14   contact with her?

15       A    Yeah. I had to take Dutch home because she

16   was spending the night with us that night. And she

17   got in my car and she just kept saying, "I can't

18   believe he did it. I can't believe he did it." And

19   then when she got to my house, she was like, "That

20   boy shot him."

21       Q    Did she say who shot him?

22       A    She didn't say. She just said, "The boy

23   shot him."

 A-60

          Q    Did you have an interview with Detective

2    Fraley, with Ms. Tsantes and myself present, this

3    past Sunday at approximately 11:00 a.m.?

4         A    Yes, I did.

5         Q    At the Attorney General's Office?

6         A    Yes, I did.

7         Q    And when specifically asked whether Dutch,

8    after saying, "I can't believe he did it, I can't

9    believe he did it, I can't believe he did it,"

10   whether she said Ralph did it, did you say, "Yes,

11   she said Ralph shot him"?

12        A    Yes.

13        Q    You said that?

14        A    Yes. When she said, "I can't believe he

15   did it, I can't believe that boy shot..." -- I said

16   who shot him, and she said Ralph.

17        Q    During approximately the month before this

18   incident, that night of the shooting incident, were

19   you somewhat close with Ralph Reed?

20        A    Yes.

21        Q    Do you know if Ralph Reed, of your own

22   personal knowledge, was selling crack cocaine in the

23   Little Creek area during that time?

                    KATHY S. PURNELL
                 OFFICIAL COURT REPORTER



                                        A-61

1    house and that's when he was telling me something

2    about Kenyon shot somebody. And that's when Kenyon

3    come behind us and called Ralph.

4            MR. ADKINS: Excuse me.

5    BY MR. ADKINS:

6        Q    When you met Ralph at the entranceway, were

7    the police up there to Little Creek?

8        A    I don't know.

9        Q    Well --

10       A    I'm sorry, but it's two entrances, and it

11   was foggy and I could not see. It was no police.

12   Because that night was the foggiest night. And the

13   way -- it's on Center Street. The entrance from

14   there --

15       Q    So you didn't hear any sirens or see any

16   lights?

17       A    No, sir.

18       Q    Well, after Kenyon and Dutch have left,

19   where did you and Ralph go?

20       A    Excuse me?

21       Q    Where do you and Ralph go after Kenyon --

22   did Dutch leave with Kenyon Horsey?

23       A    I don't know.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

         A    Yeah.  I seen Kenyon Horsey with a .380,

    because he came and showed my brother when he got

    it.  This was before, you know what I'm saying,

    before all this came around, when he first got it.

         Q    When was that?

         A.   In the fall.  It was still in the fall.

         Q    Where was that?

         A    He came right up there by where I stayed at

    in West Laurel.

         Q    West Laurel?

         A    This is right down the street from Belles

    Avenue.

         Q    Kenyon Horsey?

         A    Yes, he showed it to me and my brother.

         Q    And what was it that he showed to you and

    your brother?

         A    A .380.

         Q    And do you know this was a .380?

         A    Yes.

         Q    When you say your brother, who is your

    brother?

         A    Jontue Wise.

         Q    Was there a later time when you saw this

1    group.  Darren is another one that got called.

2    Darren didn't see that guy shoot anybody.  Sheik,

3    she didn't see him shoot anybody.  And it's not

4    because Sheik just lies, because when he asked her

5    about the bathroom, "Yeah, he had been in my

6    bathroom; I told him he had to get out."

7              Ms. Williams is the last of the four.  Ms.

8    Williams, she's called.  "Did you hear shots and

9    turn around?"  "Yes."  "Did you see him?"  "No."

10             So out of your four witnesses, out of this

11   vast of people, that's what you're left with, three

12   out of four are going to say -- doesn't say he's the

13   shooter.  One does and she's intoxicated on

14   something.

15             Now you'll rely on three other witnesses

16   who weren't on the corner, two in the apartments,

17   and one who was just coming home.  The two in the

18   apartments were Juanita Hopkins and Sarah Handy.

19   Now, you'll have the excellent work that the

20   evidence technician did, Mr. Marvel, including the

21   aerial photos.  You'll have photos identifying which

22   buildings are which, so you can examine the

23   buildings in relation to the entrance to that

1   apartment very well.

2           Now, where this took place, the entrance to
3   the apartments, is between the 200 building and the
4   300 building, and down there further is the 100
5   building.  The entrance, the 200 building, the 100
6   building.

7           We heard from a witness who was in an
8   apartment in the 200 building.  She was Sumika
9   Dixon, and Sumika Dixon said, "I could look out my
10  window and I could see the deli," because it's right
11  out her window, as you'll see as you're looking at
12  the photographs.  But she couldn't look around and
13  see the entrance.  Now, that's for the 200 building,
14  which is right next to the entrance.  Ms. Handy and
15  Juanita are in the 100 building, which is even
16  further away, further south.  They don't have any
17  view whatsoever of the entrance.  They're saying,
18  well, we looked out the window and it was Ralph.
19  Just look at those photos, the 100 building, the 200
20  building and the entrance, and see whether Juanita
21  Hopkins and Ms. Handy could see the entrance to the
22  building.

23          Mrs. Handy gave a statement to the police

1    after the incident.  She said, "I couldn't see who

2    it was."  That was her initial response, "I couldn't

3    see who it was."  But then after she had been

4    questioned repeatedly, then she could see who it

5    was.  Juanita Hopkins, the tape in the police car,

6    being promised nobody would ever know, that's

7    foolishness.  She thought it was right and she came

8    in here under oath and said she wasn't sure it was

9    Ralph.

10          Now, you were asked about the first

11   witness.  Who was the last witness?  Mr. Jefferson

12   who testified at the trial.  He's not claiming he

13   saw the shooting.  He was dropped off at his

14   apartment, at the 400 building further back in the

15   complex.  He's further back in the complex and he

16   hears shots and he has to run across the parking

17   lot.  He has to run from two buildings, by two

18   buildings.  I mean how long is that going to take?

19   It's going to take a lot more than two seconds.  The

20   shooting is going to be over.  He says, "Well, I saw

21   Ralph pointing or had his hand up."  He said he had

22   his hand up.

23          I mean here the car is going down Crockett

KATHY S. PURNELL
OFFICIAL COURT REPORTER

From: ▓▓▓▓▓▓▓ (movant)
Delaware Correctional Center
1181 Paddock Road
Smyrna, Delaware 19977

To: The Honorable T. Henley Graves
Resident Judge Of Superior Court
Sussex County Courthouse
The Circle, P.O. Box 746
Georgetown, Delaware 19947

February 25, 2005

Re: STATe v. Reed,
ID# 9911018706 (R-1)

Dear Judge Graves,
I, the Movant, write in regard to the
Arrangement in which you scheduled the Evidentiary
Hearing to be conducted on Thursday, March 3, 2005
at 9:30 in the Sussex County Superior Court.
Although movant greatly appreciate the opportunity
to be heard on his postconviction motion, however there
are several problems with the ORDER for conducting
the evidentiary hearing — 1) The Court did not
identify what issue or issues that shall be present
at the hearing.; 2) According to Rule 61 (h) (2)
for conducting such hearing, due regard must be
given for the need of both parties for adequate

A - 67

time for investigation and preparation; 3) The need
for a private investigator ex parte at court expense
will be needed to locate witness Keyshawn Banks as
indicated on page 9 of Movant's December 20, 2004
Letter-Response to this court; 4) Because Keyshawn
Banks and Jerome Reed need to be interviewed
and prepared for their in-court testimony, movant
will need the assistance of court appointed counsel;
5) Also, it was the State's Theory at trial that the
victim was fatally shot in an attempt to rip-off
drug dealers for $20 worth of crack cocaine. So
movant need to subpoena the victim's bank account
records, his brother, wife and employee Michael
Hovatter whom were with the victim earlier that
day and could verify that the victim, a successful
self-employed business man with access to plenty
of money, had no reason to steal or rip-off anybody
for drugs or money (see page 19 to 20 of movant's
December 20, 2004 Letter-Response). This evidence will
support movant's defense that someone else committed
the crime and that the victim was killed during a
robbery; 6) Since Baton claim and the unfair
Voir Dire Questions claim contained in movant's
Motion for An Evidentiary Hearing are complex
issues requiring additional historical, statistical
records and other responses, the assistance of

A - 68

court appointed counsel will be needed. For this reason
as well; And 7) Movant have no experience or legal
knowledge for conducting evidentiary hearings, questioning
witnesses, using the Rule of Evidence or other Procedures
necessary for adequate preparation and presentation.

Is the Court granting an Evidentiary Hearing on
all the issues contained in movant's December 20,
2004 Letter-Response and attachments thereto?.

In any event, pursuant to Super. CT. Crim.
Rule 61(h)(2), this Honorable Court should issue
an Amended Order - "A Controlling ORDER" for conducting
the Evidentiary hearing taking into consideration
the needs and concerns for movant's 6th and 14th
Amendment rights to compulsory process, assistance
of counsel and procedure due process of law for
the reasons outlined herein above.

Finally, if the court deny the requests respectfully
submitted herein then movant ask that the evidentiary
hearing be re-scheduled. For a later date in March
2005 in order for movant to locate and obtain the
correct addresses and names (if possible without
use of the Discovery Procedures) of all persons he want
subpoenaed to the hearing and will provide same to the
court Prothonotary. For issuing subpoenas to those people.

CC:
James W. Adkins (DAG)
Karl Haller, Esq

Thank You!
Ralph Reed

A-69

████ ; ████ ████

Delaware Correctional Center
1181 Paddock Road
Smyrna, Delaware 19977

To: The Honorable T. Henley Graves
Resident Judge
Sussex County Courthouse
The Circle, P.O. Box 746
Georgetown, Delaware 19947

April 27, 2005

Re: State v. ████, ID# 9911013706 (R-1)
(Unresolved Batson Issue)

Dear Judge Graves,

This is to memorialize the events that occurred
at the April 7, 2005 evidentiary hearing which was
a travesty of justice and a clear indication that
Delaware white judicial officials systematically
support racism in the jury selection process which
routinely uses unconstitutional voir dire questioning
policy to exclude African-Americans from jury
service and to allow all-white persons to serve
on juries whom may know the victim of crime
without any counter-questioning to identify
such persons.

1    A-20    A-70

Prior to the scheduled hearing I requested the Court to appoint an attorney to represent me due to the complexity of the issues raised in the postconviction motion, especially the Batson claim which involve the obvious unconstitutional discriminatory disparate voir dire questioning which were specifically targeted at excluding African-American venire members affiliated with the defendant, while permitting white venire members to serve on the jury who actually knew or could have been friends with the victim and his family without being identified.

Before the court ruled on my request for appointment of counsel, my mother hired an attorney to represent me at the hearing.

However, the attorney did not properly raise the Batson issue at the evidentiary hearing, or investigated and collect statistical evidence of the prosecution's use of the disparate voir dire questioning policy in other prior cases to support a Batson/Swain prima facie case of systematic exclusion of a particular race from jury service or to secure juries who knew the victim of crime. Nor did the trial court require the prosecution to satisfy step two of Batson to articulate an on record race-neutral explanation for its use of peremptory challenges and the disparate.

2    A-71    A71

voir dire questioning. As this court should know,
there is no right to the 6th Amendment effective
assistance of counsel in a postconviction motion
for defaulted claims. See, Johnson v. Ellingsworth,
783 F. Supp. 215, 221 (D. Del. 1992).

In my December 20, 2004 Letter/Brief to
the court and attachments thereto which also
support a request to Amend, I made out prima
facie case that the prosecution in fact used
disparate questioning which later resulted in
purposeful discriminatory treatment of Black and
white venire members. The United States Supreme
Court stated in Miller-El v. Cockrell, 123 S.ct. 1029,
1043 (2003), that: " It follows that if the use of
disparate questioning is determined by race at the
outset, it is likely a justification for a strike based
on the resulting divergent views would be pretextual".
Id. In this context the differences in the questioning
posed by the prosecutors are some evidence of
purposeful discrimination. Batson, 476 U.S. at 97,
106 S.ct. 1712 (" Similarly, the prosecutor's questions
and statements during voir dire examination and in
exercising his challenges may support or refute
an inference of discriminatory purpose"). Miller-El,
Id. at 1043

In my case the voir dire transcripts explicitly
show that the court itself asked any prospective

jurors who may "know the defendant or his friends or relatives", to identify themselves for purpose of being excluded. However, no such question was asked the jury panel regarding any juror who knows the victim or his friends or relatives for purpose of being excluded.

Because that question was asked the panel from the outset, every juror that revealed they knew the defendant or his friends and relatives were excluded for cause by the court or challenged for cause by the prosecution.

As I argued in my Letter/Brief, the friends and relatives of any person is of that person's own race, another statistical fact that counsel failed to proffer with available historical records in support to show the prosecution's discriminatory intent under Batson/Swain standards.

In comparison of similarly situated Black and White jurors, A black juror, Ms. Turner was excluded by the prosecution for cause because she revealed that she vaguely knew the defendant's mother. And four (4) other jurors were excluded for cause by the court for similar reasons.

Because no such question was asked the venire regarding the victim's family and friends from the outset of jury selection, no white juror, or otherwise, who may have been affiliated with the victim personally, or his friend and relatives, identified themselves to the court merely because they

Felt such information was insignificant. This is evident when viewing voir dire transcripts of a white juror, Mr. Haley, who contacted the Court on the second day of trial and stated that "he thought it might be important to inform the Court that he knew the victim's brother from work".

Knowing this information, neither the Court, the prosecution or the defendant's own trial counsel sought to have Mr. Haley excluded for cause as it did with the black juror, Ms. Turner and the other four (4) jurors who said they knew the defendant's relatives or friends. Nor did the Court or prosecution sought to find out whether or not there were anyother unidentified jurors who knows the victim's relatives and friends.

Thus the discriminatory intent of the State of Delaware in the jury selection process is indisputable by the trial record themself.

Since the prosecution has not explained away its disparate questioning of similarly situated white and black venire members which resulted in the purposeful exclusion of the Black jurors, this court must conduct a further inquiry to satisfy steps two and three of Batson's mandatory test.

But in light of the grossly unconstitutional voir dire questioning there is no way to reconstruct

the trial records to determine the identity of those
jurors who might have knew the victim's friends or
relatives which require this Court to automatically
reverse my convictions and sentences.

Finally, I ask this court to accept my Letter/
Brief Filed on December 20, 2004 and the arguments
herein as the primary Responses on the merits of
my postconviction motion before and after the
evidentiary hearing. Any Response From my Counsel
shall be deneted strictly to a mere Supplemental
Brief in support hereto.

Thank You!

~~[redacted]~~

movant

C C :
James W. Adkins (DAG)
Karl Haller (Esq)
Leo J. Ramuno

6     A - ~~65~~ A - 75

Delaware Correctional Center
1181 Paddock Road
Smyrna, Delaware 19977

To: The Honorable T. Henley Graves
Resident Judge
Sussex County Courthouse
The Circle, P.O. Box 746
Georgetown, Delaware 19947

December 20, 2004

Re: STATE v. Reed,
     ID # 9911018706 (R-1)

Dear Judge Graves,

Please accept the following as the movant,
Ralph Reed's, Reply to the STATE's and Mr. Karl
Haller's (movant's former trial counsel) Responses
to movant's Motion For postconviction relief
Filed pursuant to Superior Court Criminal Rule 61.

I. _____FacTs_____

The movant was indicted by the Sussex
County Grand Jury for the following offenses:
Murder in the First degree and possession of a
deadly weapon during Commission of a Felony.

(1)

A - ~~Cal~~   A - 76

Following a guilty verdict by a jury trial, on January 19, 2001, this court sentenced movant to a mandatory life sentence for the murder conviction and twenty (20) years in prison for the weapon charge. An appeal of the convictions was filed. The appeal was denied by the Delaware Supreme Court. This is the movant's first motion for postconviction relief.

## II. Procedural Requirements

Whenever the court considers a motion under Rule 61, it must first consider the procedural bars in Superior Court Criminal Rule 61(i). See, Bailey v. State, 588 A.2d 1121, 1127 (Del. Supr. 1991). Movant's motion has been filed in the three year time period and this is movant's first motion. So the bars in Rule 61(i)(1) and (2) do not apply. Rule 61(i)(3) bars relief if the grounds were not raised in the proceedings that led to the conviction. They will be barred unless the movant can show cause for relief and prejudice. In this case the movant has alleged ineffective assistance of counsel which would on its face show cause for relief.

In order to prevail on a claim of ineffective assistance of counsel, defendant must meet the

two-prong test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). First, a criminal defendant who raises an allegation of ineffective assistance of counsel must show that counsel's representation fell below an objective standard of reasonableness. Id. at 688. The defendant must demonstrate that counsel's performance was deficient. Id. at 687.

This entails demonstrating that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Id. Further, it is the defendant's burden to show, under the totality of the circumstances, that counsel was so incompetent that the accused was not afforded genuine and effective legal representation. <u>See</u>, <u>Renai v. State</u>, 450 A.2d 382, 384 (Del. 1982). Second, under <u>Strickland</u>, a defendant must show that there is a reasonable degree of probability that, but for counsel's unprofessional errors, the outcome of the proceedings would have been different", that is, defendant must show actual prejudice. 466 U.S. at 694.

Thus, a reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 687.

Therefore, in light of the fact that a claim of ineffective assistance of counsel can establish cause under Rule 61 (i) (3), the first prong of

(3)

Strickland have been satisfied in this case. Thus, the only issue left for this court to decide under Rule 61 (i) (3), is whether the movant can establish a sufficient degree of "prejudice" raising to a violation of Strickland's second prong. Herein below, the movant Ralph Reed's claims of ineffective assistance of counsel are argued in their entirety to illustrate that trial counsel's deficient performance prejudiced the defense and that counsel's errors during the stages of the pretrial, jury selection, at trial and on appeal were so serious as to deprive the movant of a fair trial, a trial whose result is reliable. Strickland, 466 U.S. at 697.

III.   Proposed Amended Claims

In movant's November 29, 2004, Letter To The Honorable Judge Graves regarding the granting of an Evidentiary Hearing on the Batson Claim, movant also requested an opportunity to Amend his postconviction Motion pursuant to Superior Court Criminal Rule 61 (b) (6) by leave of the court. In that Letter to the court movant briefed three (3) proposed claims he wanted Amended to these postconviction proceedings as Following:

(A). Trial Counsel Improperly Open The Door For The State To Introduce Ms. West's

(14)
A- 68   A- 79

§ 3507 Statement;

(B). Trial Counsel Failed To Request
A Full <u>Chance</u> Instruction; and

(C). Trial Counsel Fail To Raise The
<u>Brady</u> Violation.

(see Letter attached hereto Exhibit "B").

Movant note for clarity that proposed amended claim
(A) on page 2 of the letter to Judge Graves does not
argue whether or not it was improper for the court to
admit Ms. West's 3507 Statement under § 3507 during
trial. Clearly the court admitted Ms. West's prior
out-of-court Statement under D.R.E. 801 (d)(1)(A) and
D.R.E. 613 (c) & (d) for impeachment purposes only to be
weighed against the credibility of both Ms. West and
Mr. Horsey. (see Court's Jury Instructions T. Tr.
D-11 thru D-14). Although Ms. West's out-of-court
Statement was admitted under Rule 801 and 613, it
is still the product of § 3507 and the requirement
that it be voluntary is still govern by § 3507 (a).
Furthermore, Ms. West's prior out-of-court
Statement to Mr. Horsey that movant had shot the
victim was corroborated by Ms. West on Re-cross
examination by movant's own trial counsel, (T. Tr.
D-15, 16), which Satisfied the "inconsistent or

consistent" elements of § 3507, however the trial court did not admit Ms. West's prior statement under § 3507 because the proponent party seeking to introduce the allege evidence was the prosecution, not the defense. ( See Trial Court's December 14, 2000 Decision on movant's Motion for New Trial page 3 to 5).

Thus, in proposed amended claim (A) on page 2 to 5 of Letter To Judge Graves (Exhibit "B"), movant basically state the facts demonstrating how his trial counsel laid the Foundation for Ms. West's allege prior out-of-court statement could be used by the prosecution as substantive evidence under § 3507. Movant also sought to demonstrate that counsel's actions on re-cross examination of Ms. West violated his 5th Amendment right against self-incrimination because counsel intentionally elicit (or forced) Ms. West to corroborate Mr. Horsey's unsubstantiated allegations that she made the prior statement to Mr. Horsey that movant had shot the victim which also defy the principle of § 3507 that the prior statement must be voluntary.

Lastly, since the jury was instructed to weigh the credibility of Ms. West and Mr. Horsey regarding whether or not the out-of-court statement : " that movant shot the victim", were made, then trial counsel's actions on re-cross examination impermissibly weighed in Favor of Mr. Horsey's credibility and the jury could have construed such admission by

( 6 )

A -~~8~~    A - 81

Ms. West as substantive evidence that she actually saw movant shoot the victim as the prosecution contend she did on direct and re-direct examination and which is the essential element of the information in count one of the indictment charging movant with First degree murder. (T. Tr. B-180 to 184; a-192).

(D). Batson Claim:

Movant seek also to amend his Batson claim as it is argued in Movant's Motion For An Evidentiary Hearing. (See Motion Exhibit "C").

In the State's Response at paragraph 4, they premise their argue on Riley v. State, Del. Supr. 496 A.2d 997 (1985), that the prosecution did not discriminate in the jury selection process on basis of race. The standard in Riley, 496 A.2d at 1011-1013, like the Freddiman v. State, Del. Supr. Ct. No. 203, 1988, Holland, J. (February 22, 1989), holding that peremptory challenges can be exercised "not solely on the juror race" has been rejected in the Third Circuit Court decision of Riley v. Taylor, 277 F.3d 261, 285 (3rd. Cir. 2001).

Also, movant amend to give the State an opportunity to address the claim of the unconstitutional Disparate Voir Dire Questions To The Jury Panel. Even though the practice ... might not be denominated as a

(7)

Batson claim because it does not involve a peremptory challenge, the use of the practice here tends to erode the credibility of the prosecution's assertion that race was not a motivating factor in the jury selection. See, Miller-El v. Cockrell, 123 S. CT. 1029, 1044 (2003).

Thus, movant herein ask this Honorable Court to accept his previously filed Motion for Evidentiary Hearing (Exhibit "C") as an Amendment of the Batson Claim.

## IV.   Other Claims Sought For Relief

(E). Trial Counsel Failed To Properly Investigate And Subpoena Two Crucial Defense Witnesses Who Would Support Movant's Story That Kenyon Horsey Committed The Crime :

Prior to the commencement of trial movant Ralph Reed made several requests to his trial counsel to interview and subpoena Jerome Reed and Keyshawn Banks. Mr. J. Reed would have testified that he observed Kenyon Horsey Shoot and Kill Gregory Howard as Howard drove away in his Ford Bronco near the Little Creek Apartment complex. (See Jerome Reed's Affidavit attached hereto Exhibit "A").

Although movant is presently unable to locate and obtain an affidavit from Keyshawn Banks at this time, however movant expect that Mr. Banks will confirm that he possesses personal knowledge or that he was with State's witness Reshawn Jefferson on the night of the crime in question and Mr. Jefferson did not actually witness the shooting as he testified under oath at movant's trial that he observed movant standing close to the murder victim's Ford Bronco as the victim speeded away. (T.Tr. 6-68)

Thus, the trial court should appoint movant the assistance of counsel for the limited purpose to locate, interview and obtain a sworn affidavit from Reshawn Banks for these postconviction proceedings pertinent to establishing the prejudice prong of Strickland's test on counsel's reasonableness for failure to investigate.

On page 2 of trial counsel's October 1, 2004, Response to movant's postconviction motion, counsel don't deny that movant never informed him about Mr. Banks and Mr. J. Reed. However, counsel only states : " I do not have recollection of Banks-and J. Reed at the present time "; and that " Surely if these were people who could exonerate the defendant we should be getting a new trial perhaps."

(9)

A - 84

Certainly counsel's Response support a reasonable probability that movant did inform him about Banks and J. Reed but counsel was too overburden with other areas. of the trial preparation that he simply forget to interview and subpoena these two important witnesses.

Since movant only have the benefit of J. Reed's affidavit then it is a matter of principle that he limit the focus to the sworn averments by Mr. J. Reed while deferring any further comment about Mr. Banks' proposed deposition until such date and time a sworn affidavit can be obtained from him.

## Jerome Reed's Affidavit:

The sworn averments contained in J. Reed's affidavit demonstrate that trial counsel's decision not to subpoena J. Reed as a defense witness was not reasonable and prejudiced movant's defense that someone else (Kenyon Hersey) committed the crime.

First, movant has a constitutional right under both STATE and Federal law to put on "evidence of the same character tending to identify some other person as perpetrator of the crime". See, D.R.E. 404(b) and Jone v. Wood, 207 F.3d 557, 562-63 (9th. Cir. 2000). The Jones' court held that before evidence implicating another suspect can be admitted, "there must be such proof of connection with the crime, such as a train of facts or

(10)

A - 85

circumstances as tend clearly to point out some
one beside the accused as the guilty party". Id.
at 562. Furthermore the Jones' Court concluded
that ..."because the other suspect evidence was
admissible under Washington law, Jones has
established Strickland prejudice", from counsel's
failure to present such evidence at trial. Id. at 563.

Second, evidence of motive, ability and opportunity
for a third person to commit a crime is not sufficient
foundation for the introduction of other suspect
evidence. Id. at 562. Such evidence must be "coupled
with other evidence tending to connect such other
person with the actual commission of the crime
charged". Id. However, a lesser foundational
restriction applies to cases involving circumstantial
proof of crime:

> [I]f the prosecution's case against the
> defendant is largely circumstantial, then
> the defendant may neutralize or overcome
> such evidence by presenting sufficient
> evidence of the same character tending
> to identify some other person as the
> perpetrator of the crime.

See, Jones, 207 F.3d at 562-63 (citing) State v.
Clark, 78 Wash. App. 471, 898 P.2d 854, 858 (1995).

(11)

A - ~~76~~    A ~ 86

Applying this Law to the Facts of this case which is consistent with D.R.E 404(b), the averments contained in J. Reed's sworn Affidavit that he witnessed Kenyon Horsey and Yvonne DeShields engaged in a conversation with the victim G. Howard at which time a hand to hand transaction of some sort was made and as the victim pulled (speeded) away Fast in his Ford Bronco, Mr. J. Reed observed Mr. Horsey pull out a handgun and fired multiple shots at the fleeing vehicle. (see, J. Reed's Affidavit Exhibit "A"). Mr. J. Reed also stated that he observed Mr. Horsey hand Ms. DeShields the handgun and she walked off quickly towards the Graveyard. (Affidavit page 2). Lastly, Mr. J. Reed stated that just prior to the shooting he observed Ms. DeShields get into the victim's vehicle and drive around the block before meeting up with Kenyon Horsey. Id.

In contrast Mr. Horsey and Ms. DeShields, two of the State's chief witnesses against movant at trial, testified that movant committed the crime.

And the State's case was purely circumstantial consisting of Four (4) witnesses' (including Ms. DeShields) testimonies which were all inconsistent with their geographic locations from where they claim to have witnessed the crime take place at a far distant through the foggy night inclement weather-

conditions. (see Section "B" on pages 5-7 of Letter To Judge Graves regarding proposed Amended claim of Trial Counsel's Failure To Request A Full Chance Instruction which point out many of the inconsistencies in the State's witnesses' testimony, Attached hereto as exhibit "B").

Thus, the exculpatory circumstantial evidence containd in J. Reed's affidavit is proof that Mr. Hersey and Ms. DeShields Are the actual perpetrators of the crimes to which movant is convicted of committing.

To prove this connection even further Ms. DeShields' own trial testimony is conducive on this Fact. For instance, Ms. DeShields stated (a) on the night of the crime she seen the victim's vehicle at the entrance way to Little Creek Apartments and that he passed her on the street by the graveyard (T.Tr. A-129); (b) that the victim occasionally speak to her and ask's her where to buy drugs (T.Tr. A-130); and (c) she had A bullet casing from the handgun that was used to shoot the victim (T.Tr. A-153 to 155). (compare these Factors From Ms. DeShields' testimony with the averments contained in J. Reed's affidavit).

Although Ms. DeShields testified that the victim asked her where he could buy drugs, however she never stated that she referred the victim to the movant as a possible customer. A matter of fact,

(13)

A-98

Ms. DeShields testified that she purchased drugs on the night of the crime but stated she did not buy it from the movant. (T. Tr. A-158 and A-169).

Trial counsel should have argued to the jury with this evidence that it is only logical to assume that if the victim asked Ms. DeShields where to purchase drugs (and admitted that she actually purchase drugs that night also), that of course, she referred the victim to the same person she purchased her drugs from.

Movant contend (and Trial counsel should have argued) that that person Ms. DeShield referred the victim to for the purchase of drugs was in fact Kenyon Horsey which is supported by the sworn affidavit of J. Reed who eyewitnessed the entire transaction.

Therefore, under the <u>Jones</u> standard this evidence of the same character tending to identify some other person as the perpetrator of the crime was admissible under D.R.E. 404 (b). In addition, movant point out that the prosecution theory (as argued in summation) that there was no other person who could have committed the crime, a theory that movant was entitled to rebut once the prosecution relied upon it. <u>Jones,</u> 207 F.3d at 563. Movant's trial counsel's failure to subpoena J. Reed as a witness to rebut the prosecution's theory (as movant set

(14)

A - ~~89~~  A 89

Forth herein) was unreasonable and sufficient to establish the prejudice needed under Strickland to create a reasonable probability in a different outcome but for counsel's errors.

> (F). Trial Counsel's Failed To Use Inconsistencies In The State's Witnesses' Testimonies For Impeachment Purposes And To Support Movant's Defense That Someone Else Committed The Crimes :

Effective cross examination is essential to a defendant's right to a fair trial. Davis v. Alaska, 415 U.S. 308, 320, 94 S.CT. 1105, 39 L.Ed. 2d 347 (1974).

It is the "principal means by which the believability of a witness and the truth of his testimony are tested". Fensterer v. State, Del. Supr. 493 A.2d 959, 963 (1988). Under Delaware Law, " the jury is the sole trier of Fact, responsible for determining witness credibility and resolving conflicts in testimony". Pryor v. State, Del. Supr. 453 a.2d 98, 100 (1982). Jurors should have every opportunity to hear impeachment evidence that may undermine a witness' credibility.

A - ~~88~~  ~~89~~  A 90

As shown in the previous argument above where trial counsel failed to investigate potential defense witnesses who would have supported movant's theory that Mr. Horsey and Ms. DeShields were the actual perpetrators of these crimes. Because Mr. Horsey and Ms. DeShields were two of the State's chief witnesses against movant, the evidence contained in Jerome Reed's affidavit (Exhibit "A") could have been used to impeach their credibility.

In addition to the above trial counsel failed to use the inconsistencies in Ms. DeShields' testimony to discredit Sarah Handy's testimony about witnessing movant pointing and shooting a gun at the victim's vehicle.

First, Ms. DeShields testified that on the night of the crime she went to a friend's (Herman Dark) house by the Deli and bought some drugs and something to drink. (T.Tr. A-127). She heard female voices saying: "I don't believe you'll do it and then heard gunshots over from where voices were coming from". (T.Tr. A-128). The female statement "I don't believe you'll do it", can be interpret as an utterance to shoot the victim. Ms. DeShields went on to state that the shots came from the area "down the creek in front of the bench". (T.Tr. A-128). When asked on cross examination: "who were the people sitting on the bench near the

(16)

A-98

creek by Little Creek Apartments entrance-way where the Shooting occurred", Ms. DeShields replied: "That Sarah, Bacon and another unknown female were sitting on a bench three or four feet away from where the movant Ralph Reed was shooting the gun". (T.Tr. A-138, 132°, A-160, 161). However, Sarah (Handy) testified that she observed the entire shooting from her bedroom window at building # 107. (T.Tr. A-188 to 190). Movant note for the record that building # 107 is facing away to the side of the entrance way to Little Creek Apartments which makes it impossible for Ms. Handy to have witnessed the shooting from her bedroom window.

MS. DeShields' testimony place Sarah Handy three or four feet away from the shooting. Thus, Jerome Reed's Affidavit place Ms. DeShields at the scene of the shooting as confirmed by her own trial testimony. The clear implication from Ms. DeShields' testimony regarding the unknown female sitting on the bench with Ms. Handy was in fact Ms. DeShields herself.

The Question becomes - "which of the two females (DeShields or Handy) stated 'I don't believe you'll do it', meaning urging the person with the gun to shoot the victim"?

In any event, Kenyon Horsey claims the gunman was the movant and movant said it was Mr. Horsey.

(17)

A - 92

The State's witnesses, as shown above, did not testify truthfully about who in fact possessed the gun and shot the victim. At the very least, the evidence revealed here shows beyond a reasonable doubt that Ms. DeShields and Ms. Handy were actual accomplices to the murder of Gregory Howard which should have been explained to the jury and court by movant's trial counsel with a request for a full Chance instruction on all the lesser included offenses to First degree murder under 11 Del. C. § 271 and 274 as argued in Amended Claim "B" in the movant's Letter To Judge Graves (Exhibit "B").

Certainly, the testimonial evidence raises a contrary conclusion about movant being the actual perpetrator of these crimes and that the State's witnesses has placed the blame on movant to conceal their own direct involvement in the fatal shooting of the victim Gregory Howard.

Therefore, there is no way in which the failure of trial counsel to confront the State's witnesses with the grossly inconsistent testimony or use it as impeachment evidence and evidence that someone other than movant committed these crimes can be justified as sound trial strategy or a reasonable strategic choice. Thus, the prejudice prong of Strickland is established for counsel's trial errors

(18)

A - ⌖  A 93

complained of herein above in Arguments "E" and "F", and the Third Circuit Court's Ruling on ineffective assistance of counsel in Berryman v. Morton, 100 F.3d. 1089 (1996) support movant's claims for post-conviction relief. A contrary ruling would be totally unreasonable to the federal law governing the issue. Id. AT 1097-1102 (The Third Circuit reviewed each of Berryman's claims separately and found that counsel's performance strategy were unreasonable).

IV.  Counsel's Errors And Omissions Prejudiced Movant In Several Other Ways

(I). The Franks Suppression Motion:

Although trial counsel filed a motion To Suppress movant's statement to the police in which a hearing was conducted thereon as the State's Response correctly notes. However, counsel did not file a request for a Suppression hearing under Franks v. Delaware, 438 U.S. 154, 98 S. CT. 2674, 57 L.Ed. 2d 667 (1978) alleging that the police affidavit of Probable Cause in support of the arrest warrant against movant was based entirely on false information from all the State's witnesses that the police knew or should have known was

(19)
A - ▨   A 94

inaccurate. But in reckless disregard for the Truth, where investigatory facts show that other people were involved in the commission of the murder and the fact that all the money was missing from the victim's wallet found on the seat of the vehicle which indicates that the victim could have been robbed while attempting to purchase drugs, however the police rush to judgment to arrest the movant for the crime based upon an unsubstantiated theory that movant shot the victim for failing to pay for twenty ($20) dollars worth of drugs. The police made no attempt to ask the victim's family (wife or brother) or his employee, Michael Hovatter, who was with the victim earlier that day, how much money he may have possessed on the night of the crime. (see Officer Holcumb's testimony about victim's wallet T.Tr. A-107 and employee Hovatter's testimony T.Tr. A-116). The victim, a successful business man, had no reason to steal or "rip-off" anybody for drugs or money.

Thus, the facts show that Ms. DeShields lured the victim Gregory Howard to Mr. Horsey for the purpose of purchasing drugs and they both robbed and killed him.

If trial counsel had filed a timely suppression motion under <u>Franks</u> based upon the facts

(20)

A - ~~105~~  A 95

demonstrated in support hereto, it is a reasonable probability the trial court would have dismissed all charges due to invalid arrest warrant.

(J). Failure To File Motion For Acquittal :

Contrary to what the STATE and movant's trial counsel stated in their Responses that there were no basis for a Judgment of Acquittal, the movant contend otherwise. If trial counsel had properly investigated, interviewed 2 key witnesses, adequately prepared for trial and represented or argued the case from the perspective in which movant cited herein for counsel's ineffectiveness, then movant was entitled to Judgment of Acquittal pursuant to Rule 29 of the Criminal Rules. Because the STATE's witnesses testified falsely against movant to cover up their own involvement in these crimes, movant contend it would have been appropriate for the trial court to take the case from the jury and direct a verdict of Judgment of Acquittal in movant's favor. See, STATE v. Biter, 119 A.2d 894 (Del. Super. 1955). A Judgment of Acquittal denies the sufficiency of the evidence and challenges the STATE's right to go to the jury. Id. at 898. It is only where the STATE has offered insufficient evidence to sustain

(21)

A - 85   A 96

a verdict of guilt that a motion for Acquittal will be granted. Id.

Wherefore, this Court must determine had movant's trial counsel properly argued the available evidence that someone other than movant committed these crimes, under the circumstances would the trial court granted a motion for Judgment of Acquittal had counsel filed a motion after the State rested its case. Counsel's errors and Accumulated omissions prejudiced the rights of movant to receive due process of law in a timely fashion throughout the trial proceedings in violation of the 14th Amendment to the United States Constitution.

(K). Movant Was Denied Of His
6th Amendment Right To
Effective Assistance Of
Counsel On Direct Appeal :

On Appeal to the Delaware Supreme Court, trial counsel escalated his gross misconduct by using the incriminating statements he intentionally elicit from Ms. West on re-cross examination, Forcing her by threat of revoking her sentence of probation for drug convictions, to corroborate State's witness Kenyon Horsey's testimony that

(22)

A - 87    A 97

Ms. West told him that movant shot the victim. (See, Proposed Amended Claim "A" on page 2 to 5 of Letter To Judge Graves Exhibit "B" attached). Also, movant clarified his position on Ms. West's 3507 out-of-court statement allegedly made to Mr. Horsey herein above on page 5 to 7.

Trial counsel impermissibly referred to the incriminating testimony elicit from Ms. West and recited her confirmation to the statement that she told Mr. Horsey that movant shot the victim. (See Counsel's Opening Brief To The Supreme Court page 27 to 33).

The Delaware Supreme Court may have rejected movant's appeal issue relating to the trial court's instructions on the admission and limited use of Ms. West's allege prior out-of-court statement because it thought the statement was the proper product of 11 Del. C. § 3507(a) voluntariness. See, Hatcher v. State, Del. Supr. 337 A.2d 30 (1975) and State v. Rooks, Del. Supr. 401 A.2d 943 (1979), holding that 3507 statements must be voluntary product of free will. Also, see, Supreme Court's Order affirming movant's conviction Reed v. State, Del. Supr. Ct. No. 44, 2001 (Order July 12, 2001), Walsh, J. page 2 & 3 where it appear the court thought Ms. West's allege

(23)

A-98

out-of-court statement was voluntary and
properly tested on direct and cross examinations
For reliability and trustworthiness.

Had the Supreme Court known that trial counsel
elicit the incriminating testimony on re-cross
examination creating the inconsistency in Ms.
West's continuous denial on direct and cross
examinations of ever telling Mr. Hersey that
movant Shot the victim, then the Court may
have ruled differently that counsel's misconduct
violated movant's 5th Amendment right against
Self-incrimination and that because Ms. West
was threaten with her prior drug conviction
to Recant her denial of the out-of-court
Statement to Mr. Hersey, the voluntariness
requirement pursuant to 11 Del. C. § 3507 was
not satisfied prior to admitting the statement
under D.R.E. 801(d)(1)(A) and D.R.E. 613 (c) and
(d). See United States v. Manning, 212 F.3d 835,
845 (3d. Cir. 2000) (counsel's failure to raise the
sentencing issue on direct Appeal prejudiced
defendant because the Court would have vacated
Sentence had the claim been raised).

The Due Process Clause of the 14th Amendment
guarantees the right to effective assistance
of Counsel on a First Appeal. See Evitts v. Lucey,

469 U.S. 387, 396-99 (1985). If counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing", as is the case here, the adversarial process itself becomes presumptively unreliable. See, United States v. Cronic, 466 U.S. 648, 659 (1984). Trial Counsel's errors or misconduct in the case at bar acting as a second prosecutor constituted denial of assistance of counsel and court need not establish actual prejudice. See, Rickman v. Bell, 131 F.3d 1150, 1156-60 (6th. Cir. 1997).

Therefore any subsequent Jury Instructions for consideration of Ms. West's allege 3501 statement were constitutionally infirm and plain error.

### Conclusion

Wherefore there exist an overwhelming probability that but for trial counsel's accumulated errors and omissions in the pretrial stage, at trial and on appeal the Courts would have entertained a different result.

Thus, since Strickland prejudice is satisfied on one or all counsel's trial errors complained of herein and attached exhibits "A", "B" and "C", the resulting convictions and sentences imposed upon movant for murder and weapon offenses are unworthy of confidences in their outcomes. Movant is entitled to a new trial as appropriate postconviction relief.

(25)

A - A 100

Lastly, and since movant made a valid claim that someone other than he committed the crimes to which he is convicted qualify as evidence of actual innocence under Superior Court Criminal Rule 61 (i) (5) to which no procedural bar apply. For the Federal court to review the claim.

_Ralph Reed_
Ralph Reed, pro se
Movant

( 2 6 )

A - ☞ A / 6 /

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR ___ $S u S S e X$ ___ COUNTY

STATE OF DELAWARE &ast;

    V. &ast;    CrA. No.: _____

&ast;    $I D \# G 9 1 1 0 1 8 7 0 6 (R-1)$

<u>Ralph Reed</u>
  Defendant

## AFFIDAVIT

I, <u>Jerome B Reed</u>, being duly sworn, deposes and says: I WAS AT Little CREEK APARTMENTS ON 11-23-99 AT 10:30 P.m. When A BLue; White FORD BRONCO CAME UP The STREET With A White MAN DRIVING THE Blue; White FORD BRONCO, I WAS STANDING IN THE PARKING lot of Little CREEK APART-MENTS. WHEN This LAdy NAME YVONNE DeShields WAS STANDING ON the CORNER of Little CREEK APARTMENTS STORE CORNER. When YVONNE DeShields STopped the BLUE; White FoRd BRONCO With A White MAN DRiving. YVONNE DeShields Then WAlked OVER To the Blue; White Ford BRonco DRiVER'S Side AND WAS TAIking about SomeThing with The White MAN. YVONNE DeShields Then WAIKed ARound to the PASSENGER'S Side of the Blue; Whit FoRD BRonco and got in AND They dRove OFF, only dRiving ARound the Block AND BACK to the SAME CoRNER WheRe SHE got picked up AT The STORE CoRNER of little CREEK APARTMENTS. YVONNE DeShields Then got out of the Blue; white FoRD BRonco AND Called this otheR CAR that WAS Coming

Jerome Reed

SUBSCRIBED AND SWORN before me this 24th day of November , 2004 -

Timothy J. Martin
(Notary Public)

my Commission expines: June 14th, 2006

Ex. A 1

$A - \text{(stamp)} \quad 17 / 02$

"WENT UP to the DRIVER'S SIDE OF THE CAR AND WAS SAYING SOMETHING
KENYON HORSEY, I DON'T NO WHAT SHE WAS SAYING TO KENYON HORSEY
BUT THE DRIVER THEN GOT OUT OF HIS CAR AND WENT UP TO THE BLUE:
WHITE FORD BRONCO TO SPEAK WITH THE WHITE MAN. KENYON HORSEY
THEN WENT IN HIS POCKET AND PULLED SOMETHING OUT AND GAVE IT TO THE
WHITE MAN THAT WAS DRIVING THE BLUE: WHITE FORD BRONCO, THE WHITE
MAN THEN PULLED OFF. KENYON HORSEY THEN PULLED OUT A GUN AND
SHOT AT THE WHITE MAN, IN THE BLUE: WHITE FORD BRONCO, I don't KNOW
how SHOTS WERE FIRED BUT THE WHITE MAN THEN RAN INTO A HOUSE
WITH HIS BLUE: WHITE FORD BRONCO. KENYON HORSEY THEN GAVE THE
GUN TO YVONNE DeShields I COULDN'T HEAR WHAT KENYON HORSEY
SAID TO YVONNE DeShields BUT SHE THEN WALKED OFF QUICKLY TOWARD'S
THE GRAVEYARD. LATER that Night YVONNE DeShields WAS SITTING IN
KENYON HORSEY CAR IN Little CREEK APARTMENTS PARKING LOT TALKING
ABOUT SOMETHING THAT WAS THE LAST I SEEN OF YVONNE DeShields
AND KENYON HORSEY.

*Jerome Reed*

Subscribed before me and
Notarized on PS 1 of this
document  TTM

(2)
Ex. A 2
A — 🐚    A 103

```
 1     day it was -- yeah, I was there smoking crack, but
 2     that day was all -- it was foggy, really foggy out.
 3         Q    You are smoking with her, trying to get
 4     intimate with her, and you wouldn't be surprised if
 5     she said I have never seen him, never knew his name,
 6     never knew him at all?
 7         A    Yeah, I would.
 8         Q    You wouldn't be surprised?
 9         A    I wouldn't be surprised.
10         Q    Well, how is it that you knew Kenyon's name?
11       ' A    I knew his name because when the shooting
12     occurred the lady hollered out that name.
13         Q    What did she say?
14         A    She just said, "No, no, no.  Keyon, no, no."
15         Q    Is it Keyon or Kenyon?
16         A    I think it's Keyon.
17         Q    Keyon?
18         A    I can't pronounce the name right, but Keyon.
19         Q    Did she say his last name?
20         A    No.
21         Q    And you can't think of Keyon's last name,
22     can you?
23         A    I never knew the lady's last name.
```

```
 1              THE COURT: Call your next witness, if any.
 2              MR. RAMMUNO: That's all I have, Your Honor.
 3              THE COURT: State call the witnesses. ·
 4              MR. ADKINS: Yes. The State calls Sonja
 5     Lewis.
 6              THE COURT: Do you have a date of birth of
 7     that person that you say is incarcerated?
 8              MR. RAMMUNO: No, Your Honor.
 9              THE COURT: Don't have a name. Can't check
10     it for you, sir. Don't have a proper name. I need
11     the full, proper name because there are a lot of them
12     in the computer with different spellings.
13              Swear the witness.
14     Whereupon,
15                   SONJA KIMBERLY LEWIS
16     was called as a witness by and on behalf of the State
17     of Delaware and, having been first duly sworn, was
18     examined and testified as follows:
19                   DIRECT EXAMINATION
20     BY MR. ADKINS:
21       Q    Good afternoon, Ms. Lewis. Ms. Lewis, by
22     whom are you employed?
23       A    Department of Corrections at Delaware
```

A-105

1    Correctional Center in Smyrna.

2        Q    DCC in Smyrna?

3        A    Yes.

4        Q    How long have you been employed by the

5    Department of Corrections?

6        A    Fifteen years.

7        Q    And in what capacity are you employed by the

8    Department of Corrections?  At this time what is your

9    job or job title?

10       A    Currently, I am the transfer administrator.

11       Q    And what is the transfer administrator do?

12       A    Basically, what we do is -- what I do is I

13   assign individual inmates to different units,

14   different cells according to their classification or

15   for health purposes or safety purposes.

16       Q    And do you maintain records of all these

17   transfers in your office, and personally, do you

18   maintain these records?

19       A    Yes, I do.

20       Q    And so if I was to give you a name of a

21   certain inmate and SBI number, would you be able to

22   tell where they were at certain times?

23       A    Yes, I can.

1      Q      Previous to today, were you asked to look up
2  those types of records with regard to a Jerome Reed,
3  which is SBI No. 318410?

4      A      Yes.

5      Q      And also with respect to a Ralph Reed, SBI
6  No. 320813?

7      A      Yes.

8      Q      Now this Jerome Reed that you are looking up
9  records on, is that the same Jerome Reed that is
10  serving a lengthy sentence for robbery first,
11  kidnaping, burglaries, possession of a firearm during
12  the commission of a felony, those types of offenses?

13     A      Yes.

14     Q      And this Ralph Reed that has that SBI number
15  I mentioned, is he the same person that is serving a
16  sentence, life sentence, for first degree murder out
17  of a 1999 incident?

18     A.     Yes.

19     Q      Between the dates of May the 10th, 2004, and
20  the date of June the 22nd, 2004, can you tell me what
21  building and tier and cell this Jerome Reed was
22  assigned to?

23     A      Yes.  He was assigned to Building 22, A

129

1    Tier, lower level, Cell 11, top bunk.

2         Q    And between the dates of May 10th, 2004, and

3    June the 22nd, 2004, the same dates, can you tell me

4    the building, tier, and cell that Ralph Reed was

5    assigned to?

6         A    Yes.  Building 22, A Tier, lower level, 11

7    Cell, bottom bunk.

8         Q    Does that mean that Jerome Reed and Ralph

9    Reed were there in the same building, the same tier,

10   the same cell, with Jerome Reed being on the top bunk

11   and Ralph Reed being on the bottom bunk?

12       ; A    Yes.

13        Q    And is that what your records indicate?

14        A    Yes.

15        Q    And do you have a summary of that that you

16   brought with you today that actually shows those

17   dates?

18        A    Yes, I do.

19        Q    Could I see that top page summary?  Now, the

20   one you handed me is with respect to Ralph Reed,

21   correct?

22        A    Yes.

23        Q    Do you have one for Jerome Reed?

A-108

1        A    Yes.

2        Q    I just asked you the dates of, Ms. Lewis,

3    between May 10th, '04, and June 22nd, '04.  Actually

4    with respect to Jerome Reed, do you have the date

5    that he was in that building, tier, and cell

6    beginning what date and ending what date?

7        A    Beginning May 10, '04, and ending

8    February 22nd, '05.

9        Q    And how about Ralph Reed?  Do you have the

10   dates that he was in the 22 building, that tier, and

11   cell?

12     ,  A    That is September 17th, '03, and June 22nd

13   of '04.

14       Q    So is there an overlap in those dates?

15       A    Yes, that would be one month and twelve

16   days.

17       Q    That they were in the same --

18       A    Same cell together, yes, sir.

19       Q    -- cell?

20            MR. ADKINS:  Your Honor, I'm going to offer

21   these two summaries.  I think there is an objection.

22            THE COURT:  The objection is?

23            MR. RAMMUNO:  Your Honor, these appear to be

1    memos from Heidi Shrom to Michael Little, nothing to

2    do with this person. I mean they're hearsay,

3    obviously, because they're from somebody else. ·They

4    are not official records. I don't know if'they are

5    official records of DCC or not. I think there would

6    be more official records than somebody from a memo.

7        MR. ADKINS: Your Honor, I am offering them

8    as a summary. She has her records in her folder, and

9    there is just certain records I believe she has to

10   take back with her. So we can copy everything in her

11   folder as far as I am concerned. She has records

12   with her. These are just summaries.

13       THE COURT: Why don't you let him see during

14   our next break the actual records, and if we have to,

15   if she is going to offer them as business records,

16   offer them, or if it is Rule 10 or 11 summaries can

17   be offered, but I will give counsel the opportunity

18   to look at that in a few minutes. If we have to take

19   a break before he examines her to look at that, we

20   can do that also.

21   BY MR. ADKINS:

22       Q    Thank you. Do you have those records that I

23   am referring to there in your folder?

```
 1       A     Yes.

 2       Q     That support those summaries?

 3       A     Yes.

 4       Q     And do you maintain those records?

 5       A     Yes, I do.

 6       Q     And do you maintain them in the normal

 7   course of your business?

 8       A     Yes, I do.

 9       Q     At the Department of Corrections?

10       A     Yes, I do.

11    •  Q     Is it your job to do so?

12    ,  A     Yes, it is.

13             THE COURT:  Do the summaries actually

14   capture your records?

15             THE WITNESS:  Yes, and the reason why Heidi

16   Shrom's name is on there is I am currently training

17   her to take my place whenever there is an absence.

18   She was asked to type that memo for me.

19   BY MR. ADKINS:

20       Q     After she typed that memo for you, did you

21   search the records and confirm the accuracy of those

22   records and that summary?

23       A     Yes.  Yes.  In fact, I found the records for
```

A - 101

1    her.   She typed the summary for me.

2              THE COURT:   Cross, voir dire?

3              MR. RAMMUNO:   Your Honor, I would like to

4    see the records, obviously.

5              THE COURT:   All right.   We will take a

6    break.   Take a look at them.

7              (Whereupon, a brief recess was taken.)

8              THE COURT:   Counsel, have you given the

9    Clerk the name?

10             MR. RAMMUNO:   The only thing I have is what

11   I have given.   I don't have any other name.

12             THE COURT:   If you don't have a full name, I

13   can't help you.

14             Cross.   Cross-examination?

15                       CROSS-EXAMINATION

16   BY MR. RAMMUNO:

17        Q    The record that you are relying on, that we

18   just saw, is basically a transfer list of the

19   individuals on a particular day, correct?

20        A    Yes.

21        Q    And the records that you have in your file

22   show the name of Ralph Reed, correct?

23        A    Yes.

```
 1        Q      But it doesn't show his correct SBI number?
 2        A      Correct.
 3        Q      What SBI number is associated to the Ralph
 4     Reed that was transferred to Building 22, A Tier, 11,
 5     top or bottom, I guess 11 bottom?
 6        A      The name that appears above him is the same
 7     SBI number?
 8        Q      That is not my question.  My question is
 9     what SBI number appears next to Ralph Reed's name
10     that was transferred to Building 22, A Tier?
11     * A      The name that is above his is the SBI
12     number.
13        Q      What is the number?
14        A      304503.
15        Q      304503.  And what is Ralph Reed's SBI
16     number?
17        A      320813.
18        Q      They are not the same SBI number, correct?
19        A      Correct.
20        Q      Do you know if there is more than one Ralph
21     Reed being held at the Delaware Correctional Center
22     between the months of May 10th of 2004 to June 22nd,
23     2004?
```

1    A    There is just one, just one.

2    Q    And how do you know that?

3    A    Because I maintain the records.

4    Q    So you have all the records during that

5    period of time in front of you?

6    A    No, I don't.

7    Q    And the information that you are relying on

8    is not information that you, I guess, prepare

9    yourself?

10   A    Yes.

11   Q    You have not brought in a -- by the way, you

12   do maintain, I guess, data base for that computer,

13   correct?

14   A    Yes, I do.

15   Q    And that computer could tell you exactly

16   where everybody is housed at any given day, correct?

17   A    Yes.

18   Q    And that would be done on the computer

19   printout-type of situation?

20   A    No.  It's just kept in the data base. - We

21   don't need to print that information out.  It's too

22   much.

23   Q    Well, could you print out that information

```
 1    Whereupon,

 2                        MATTHEW ZOLPER

 3    was called as a witness by and on behalf of the State

 4    of Delaware and, having been first duly sworn, was

 5    examined and testified as follows:

 6                        DIRECT EXAMINATION

 7    BY MR. ADKINS:

 8        Q    Officer Zolper, is it true that you are

 9    employed by the Delaware State Police?

10        A    Yes.

11      . Q    How long have you been with the Delaware

12    State Police?

13        A    Since November of 1993.

14        Q    And in what type of unit are you serving

15    with the Delaware State Police currently?

16        A    Currently, I am assigned to the Delaware

17    State Police Troop 4 Youth Aid Unit.

18        Q    And how long have you been doing that?

19        A    I was assigned to the Youth Aid Unit in

20    August of 2003.

21        Q    Prior to August 2003, what unit were you

22    with?

23        A    I had served on patrol at Troop 7.  I had
```

1   served in the Delaware State Police Special

2   Investigations Unit, and once again patrol at Troop

3   7.

4        Q    The Delaware Special Investigatiohs Unit,

5   does that deal basically with enforcement of the drug

6   laws and sort of drug enforcement unit?

7        A    That's correct.

8        Q    And do you know approximately what years you

9   were in that drug unit?

10       A    Yes, I was a member of the Special

11  Investigations Unit from December of '96 until the

12  end of January '02.

13       Q    So basically '96 through 2002?

14       A    Yes, sir.

15       Q    During that time period, did you work with

16  and assist and pass on information to the homicide

17  unit if you received any tips or leads about

18  homicides while you were in the drug unit?

19       A    Yes.  If we received any information, there

20  was a crime that we needed to investigate, two things

21  would happen.  We would contact the unit and let our

22  XO, commanding officer, know, Lieutenant Donaway.

23       Q    And being in that Special Investigations

1    Unit, that drug unit, did you have the opportunity to

2    work with confidential informants?

3        A    Yes, I did.

4        Q    Therefore, did you have the opportunity to

5    acquire and obtain leads on other cases other than

6    the drug cases, such as homicide cases?

7        A    Yes, sir.

8        Q    Do you know a person by the name of Jerome

9    Reed?

10       A    Yes, sir.

11     . Q    Did he go by any nickname?

12     ₁ A    Yes.  He had a nickname that we would call

13    him Smiley sometimes.

14       Q    In either November or December of 1999, did

15    Jerome Reed or the person known as Smiley ever come

16    to you and indicate that he had some kind of special

17    information on who did the shooting at a homicide

18    occurring November 23rd, 1999, at Little Creek

19    Apartments in Laurel, Sussex County, Delaware?

20       A    No, he did not.

21       Q    Did he ever come to you during that time

22    period and ask you to set up a meeting at JP Court

23    with the investigating officer on that particular

1    homicide?

2         A     No, he did not.

3         Q     In fact, by late November of '99, and into

4    December of '99, were you even using Jerome Reed --

5    well, had you made any determination as of

6    December 1999 as to whether you would even use him as

7    a reliable confidential informant?

8         A     Yes.   Myself and the Commanding Officer had

9    decided that in September of that year that we were

10   going to be finished, or I was going to be finished

11   using him as a confidential informant.

12       Q     Did the falsely reporting conviction have

13   any impact on that decision?

14        A     It did.

15        Q     Okay.   And in November and December of 1999,

16   was there anything special happening in your life

17   that took you away from work?

18        A     There was.

19        Q     What was that?

20        A     My second child was born in October of '99.

21   My wife was high risk, and she had an emergency

22   surgery when she was pregnant, and we didn't know the

23   outcome, and I had finished in something of September

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A - 169

1    that year leading right into that birth.  I was not

2    able to take the time that I wanted and was

3    consequently allowed that time to take off the end of

4    November and end of December.

5         Before the end of the calendar year, I took

6    several weeks from roughly the third week,

7    Thanksgiving, that time through Christmas, several

8    weeks off, that I normally didn't have because I had

9    missed the time off when my wife had the -- when we

10   had our second child in October.

11        MR. ADKINS:  Thank you very much.

12        THE COURT:  The question was did he ever

13   come to you?  Did he call you, contact you?  Did you

14   have any communication at all with him?

15        THE WITNESS:  Jerome Reed would call the

16   office a lot.

17        THE COURT:  Did he call and talk to you

18   about any of these things that we just talked about?

19        THE WITNESS:  No.

20                CROSS-EXAMINATION

21   BY MR. RAMMUNO:

22        Q    How long had you been working with Jerome

23   Reed?

Adult
Complaint and Warrant
In the Justice of the Peace Court
In and for the State of Delaware
State of Delaware vs RALPH REED J

I, JAMES FRALEY (07129), of DELAWARE ST. POLICE HEADQUARTE do hereby state
under oath or affirmation, to the best of my knowledge, information and belief
that the above-named accused violated the law of the state of Delaware by
committing criminal acts in Sussex county on or about the date(s) and at or
about the location(s) as indicated in Exhibit A hereto attached and made a
part hereof.

WHEREFORE, your affiant prays that the above named accused may be forthwith
approached and held to answer to this complaint consisting of 2 charges, and
to be further dealt with as the law directs

Affiant _____ 7129

SWORN TO and subscribed before me this 20 day of November A.D., 1999

Judge/Master/Commissioner/Court Official

======================================================================

(To be completed by Judge/Master/Commissioner/Court Official
Jurisdiction resides in Family Court because: (Check and complete as required)
A._____ The crime was committed by a child
B._____ A misdemeanor was committed against a child
C._____ A misdemeanor was committed by one family member against
             another family member
D._____ Other. Explain _____

======================================================================
                              WARRANT

TO ANY CONSTABLE or other authorized person:

WHEREAS, the foregoing complaint consisting of 2 charges, having been made, as
listed in Exhibit A which is attached hereto and incorporated herein, and
having determined that said complaint has been properly sworn to, and having
found that there exists probable cause for the issuance of process, based upon
the affidavit of probable cause which is attached hereto and incorporated
herein as Exhibit B, you are hereby commanded in the name of the State of
Delaware, to take RALPH REED J accused, and bring same before

JUSTICE OF THE PEACE COURT 03, FORTHWITH, to answer said charges.

GIVEN UNDER MY HAND, this 24 day of November

Judge/Master/Commissioner/Court Official

Warrant executed by FRALEY          of 00     on 24 November, 1999.
Police Complaint No 0599041333      WR:0099060573:WR

                                              9911018706

Exhibit A

State of Delaware vs RALPH REED J                           $ps\ 99\ 4758$

----------------------------------------------------------------------------
                   $99-12-0398$          Court Case: 9911018706
----------------------------------------------------------------------------
Complaint Number: 0599041333     Arrest Number: 20395     Charge Sequence: 001
Charge: MURDER FIRST DEGREE INTENTIONALLY CAUSED DEATH OF ANOTHER PERSON
In Violation of: 11-DE-0636-00a1-F-A
Location of Violation: CROCKETT STREET & W. 6TH STREEET L/O LAUREL, DE
 TO WIT: RALPH  REED  J,  on or about the 23rd day of November, 1999,  in  the
      County  of  Sussex,  State of Delaware, did intentionally cause  the
      death of GREGORY T HOWARD.          $99-12-0399$

Complaint Number: 0599041333     Arrest Number: 20395     Charge Sequence: 002
Charge: POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY
In Violation of: 11-DE-1447-A00A-F-B                        $s\ 99\ 4759$
Location of Violation: CROCKETT STREET & W. 6TH STREEET L/O LAUREL, DE
 TO WIT: RALPH  REED  J,  on or about the 23rd day of November, 1999,  in  the
      County of Sussex, State of Delaware, did possess a firearm during the
      commission of the felony of MURDER 1ST

Exhibit B
Affidavit of Probable Cause

State of Delaware vs RALPH REED J          Police Complaint: 0599041333
Also known as:                             SBI Number: 00320813
Date of birth: 12/18/1980    Sex: M        Race: B    Accused's age: 18
Eyes: BRO    Hair: BLK    Height: 604      Weight: 200
Accused's home add: 528 WEST 7TH STREET    Social Security Number 221625633
                                           Driver's License DE - 1193373
          : LAUREL, DE 19956

                                           Name, Home and Work Addresses, and
Accused's Home Ph : 3028752984             Telephone Numbers of Next of Kin
                                           or Parent/Guardian
Accused's employer:                        : ELDORA REED
                :                          : 528 WEST 7TH ST.
                :                          :

                                              : LAUREL, DE 19956
Accused's Emp Pho: 0                       Phone: 3028752984
Accused's Work Hr:                         Work :
                                                :
                                                :
Relation: Vict to accused: STRANGER             :

Victim's Age : 35
Victim's D.O.B. : 04/11/1964
Date(s) and time(s) of offense: 11/23/1999 22:30 thru 22:38
Location where offense occurred: CROCKETT STREET & W. 6TH STREEET L/O LAUREL, D

   Your affiant JAMES FRALEY can truly state that:
   1.   YOUR AFFIANT IS A DETECTIVE WITH THE DELAWARE STATE POLICE HOMICIDE UNIT
AND HAS BEEN EMPLOYED BY DSP FOR OVER 15 YEARS.
   2.   ON  TUESDAY (11-23-99) YOUR AFFIANT WAS ASSIGNED A  SHOOTING  COMPLAINT
WHICH  OCCURRED  ON CROCKETT ST. & WEST 6TH STREET WITHIN THE TOWN  LIMITS  OF
LAUERL,  DE.   THE INVESTIGATION SHOWED THAT THE INCIDENT TOOK PLACE ON TUESDAY
(11-23-99) BETWEEN 2230-2238 HRS.
   3.   A WHITE MALE (VICTIM/GREGORY T. HOWARD) RECEIVED ONE GUN SHOT WOUND  TO
THE  BACK OF THE HEAD.  AFTER THE VICTIM WAS SHHOT, HIS VEHICLE TRAVELED NORTH
BOUND ON CROCKETT STREE AND CRASHED INTO A RESIDENCE ON wEST 7TH STREET.   THE
VICTIM  WAS TAKEN TO NANTICOKE MEMORIAL HOSPITAL WHERE HE WAS PRONOUNCED  DEAD
AT 2332 HRS. BY DR. CHRIS ROBERTS.
   4.   AN  AUTOPSY  WAS  PERFORMED  ON WEDNESDAY  (11-24-99)  AT  THE  MEDICAL
EXAMINERS OFFICE IN WILMINGTON BY DR. PEARLMAN.  THE MANNER OF DEATH WAS RULED
A HOMICIDE, AND THE CAUSE OF DEATH WAS A GUNSHOT WOUND OF THE HEAD.
   5.   A CRIME SCENE INVESTIGATION WAS CONDUCTED.  (4) .380 CASINGS WERE FOUND
NEAR  A  STOP SIGN AND THE ENTRANCE SIGN TO LITTLE CREEK APARTMENTS.   WITNESS
INTERVIEWS WERE ALSO CONDUCTED IN THE AREA OF LITTLE CREEK APARTMENTS.
   6.   A COOPERATING WITNESS STATED THAT SHE HEARD TIRES SQUEELING AND  LOOKED
OUT  FROM  HER  SECOND STORY APARTMENT.  THIS WITNESS STATED AND  SHOWED  YOUR
AFFIANT THAT SHE HAS A DIRECT VIEW OF THE STOP SIGN AND LITTLE CREEK APARTMENT
ENTRANCE SIGN, AS WELL AS A VIEW OF CROCKETT STREET.  THIS WITNESS STATED THAT
WHEN  SHE  OBSERVED DEF/REED STANDING BETWEEN THE STOP SIGN AND THE  ENTRANCE
SIGN  AND FIRE 4 OR 5 SHOTS TOWARDS A VEHICLE.  THIS WITNESS STATED THAT SHE IS
POSITIVE IT WAS DEF/REED, BECAUSE THIS WITNESS HAS KNOWN DEF/REED FOR A NUMBER

Det. J. P. Fraley   7129
         (Affiant)

                              (Judge-Master Commissioner-Court Official)
                                 Sworn to and subscribed before me
                                 this 24 of November, 1999

A-158

Exhibit B

Statement of Probable Cause (Continued)

State of Delaware vs RALPH REED J

OF YEARS.

7.   ANOTHER COOPERATING WITNESS WAS INTERVIEWED AND STATED THAT DEF/REED WAS SEEN   IN   THE AREA JUST BEFORE THE SHOOTING OCCURRED.   THIS WITNESS KNOWS   THE DEF/REED.

8.   ANOTHER COOPERATING WITNESS WAS INTERVIEWED AND STATED DEF/REED WAS NEAR THE LITTLE CREEK DELI JUST BEFORE THE INCIDENT HAPPENED.   LITTLE CREEK DELI IS APPROXIMATLEY   50   YARDS FROM THE STOP SIGN AND ENTRANCE SIGN TO LITTLE   CREEK APARTMENTS.

9.   ANOTHER COOPERATING WITNESS WAS INTERVIEWED AND STATED THAT ON   TUESDAY (11-23-99)   DEF/REED   AND THIS WITNESS HAD WORDS.   THE WITNESS   OWED   DEF/REED SOME   MONEY.   THIS WITNESS STATED THAT DEF/REED SHOWED HIS A FIREARM AND   TOLD THE   WITNESS   THAT HE WANTED HIS MONEY.   THE WITNESS STATED THE FIREARM WAS   A .380 HANDGUN.   YOUR AFFIANT ASKED THIS WITNESS HOW HE/SHE KNEW THE HANDGUN WAS A .380.   THE WITNESS STATED HE/SHE IS FAMILIAR WITH THE .380 HANDGUN.
============================================================================

Affiant:
JAMES FRALEY DELAWARE ST. POLICE HEADQUARTE Phone Work

Victims:
GREGORY T HOWARD

Sworn and subscribed before me this 24 day of November A.D. 1999

Judge/Master Commissioner Court Official

**Delaware State Police/Homicide Unit**
**Continuation Sheet**
**Complaint #05-99-41333**
**Det. James P. Fraley #7129**



### INTERVIEW DEFENDANT

**Ralph Reed Jr. BM-18 (12-18-80)**
**528 W. 7th Street**
**Laurel, DE**
**302-875-2974**

On Wednesday (11-24-99) Def/Reed was taken into custody by uniformed members of the Delaware State Police at 1146 hrs. Def/Reed was placed into my vehicle and at 1147 hrs. I advised him of Miranda and he stated he understood. Sgt. Charles Brown was present during this. The defendant was taken to Laurel Police Department and was questioned by myself and Lt. Robert Hawkins. I advised the defendant of Miranda again and he stated he understood. Def/Reed denied being involved in the incident. Def/Reed gave a taped statement at 1409 hrs. See transcribed statement attached to this report. *While enroute to Troop 4, Def/Reed asked me why we picked him out. I advised Def/Reed again about witnesses who we interviewed. I then asked him what he did last night and if he was near the Little Creek Deli and where he slept. Def/Reed stated that he was hanging out in front of the Apartments with some friends, but would not say who they were. Def/Reed stated that around closing time he went to the deli and "Got some food from the woman", then went to his grandmother's house. Def/Reed went to his grandmother's house after he was in the deli and went to bed. I asked Def/Reed if he wanted to put this information on a taped statement and he said no. *(See attached statement for details)*

EXhibit B-1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

| | |
|---|---|
| THE STATE OF DELAWARE | * CRIMINAL ACTION NOS. |
| | * S99-12- 0398 - 0399 |
| vs. | * |
| | * |
| RALPH REED, JR. | * INDICTMENT BY THE |
| I.D. 9911018706 | * GRAND JURY |
| | * |

The Grand Jury charges that RALPH REED, JR. did commit the following offense(s), to-wit:

## COUNT 1 - MURDER IN THE FIRST DEGREE - S99-12- 0398

RALPH REED, JR. on or about the 23rd day of November, 1999, in the County of Sussex, State of Delaware, did intentionally cause the death of Gregory T. Howard by shooting him with a gun, in violation of Title 11, Section 636(a)(1) of the Delaware Code.

## COUNT 2 - POSSESSION OF A FIREARM DURING THE COMMISSION OF

## A FELONY - S99-12- 0399

RALPH REED, JR. on or about the 23rd day of November, 1999, in the County of Sussex, State of Delaware, did knowingly possess a firearm during the commission of a felony by possessing a handgun, during the commission of Murder in the First Degree as set forth in Count One of this Indictment which is herein incorporated by reference, in violation of Title 11, Section 1447A(a) of the Delaware Code.

A TRUE BILL

(Foreperson)

(Secretary)

s/M. JANE BRADY
ATTORNEY GENERAL

DEPUTY ATTORNEY GENERAL

DATE: DECEMBER 13, 1999
jj

1   after they check it.  All right.

2        Last week we had a discussion.  The State

3   came forward concerning potential 404(b) evidence and

4   I have had an opportunity to look at 404(b) Getz, some

5   of the Getz case law and also the DeShields, which is

6   Getz case law impacting on the prejudice potential.

7   The testimony kind of breaks down into three areas.

8   You all can correct me if I'm wrong.  As I broke it

9   down and understood it, one area concerned the State's

10  efforts to put a pistol or a gun in the possession of

11  the defendant the day of the offense.  And the

12  allegations or the proffer is that the State has a

13  witness that would say that a confrontation took place

14  in the morning concerning a quality issue of marijuana

15  or some issue of marijuana that was allegedly sold by

16  the defendant to that witness.  There was some

17  discussions and there was a display of what appeared

18  to be a .380 and that the witness was able to

19  differentiate.  Number one, the witness can testify it

20  was a pistol.  And, number two, the witness thought it

21  was a .380 based upon the witness picking out a .380

22  at the police station or recognizing what a .380 looked

23  like.  As to that, depending on the circumstances, the

1    usage of the gun which we talked about last week, it

2    is not illegal to possess a gun.  It is illegal to

3    possess a gun under some circumstances wherein the gun

4    may be concealed.  The concerns that I have are

5    basically the prejudicial aspect.  I am satisfied that

6    the gun in the incident in the morning is material

7    because the gun was not recovered and the State is

8    trying to tie a .380, which had casings at the scene,

9    to the defendant and to the defendant's possession of

10   a gun.  Identification linkage is one of the more

11   important aspects:  MIMIC:  Motive, intent, mistake,

12   or lack of identity and common scheme were the

13   standard, but this is exclusive, but these are one of

14   the classics and there is identification linkage.  The

15   State proffered that they will have live testimony

16   under oath as to this and I think it meets the clear

17   and convincing evidence test.  Based upon the proffer,

18   it's not remote in time.  A limiting caution will be

19   given.

20        Here is the problem:  What you have is, if

21   you go into the entire incident in the morning, if you

22   go into the entire incident in the morning based on

23   the proffer, I think there is a lot of potential

```
 1    prejudice when I look at the DeShields' case.  The

 2    testimony would basically paint the defendant as a

 3    hoodlum, as intimidating.  And I think the testimony

 4    for purposes of identification is that that testimony

 5    can be restricted and limited to the fact that the

 6    witness can testify as to seeing the weapon, seeing

 7    the defendant with the weapon, but the witness doesn't

 8    have to get into the circumstances of the

 9    intimidation, the bullying, and the disputes which

10    could raise the prejudice potential significantly.  So

11    I think the State is going to have to spend some time

12    with that witness, whoever that person is, and

13    restricting it as to the circumstances as to -- that

14    he saw the weapon on the defendant, when he saw the

15    defendant with the weapon and restrict it to that.

16         I don't think you need to go into the other

17    portions of it.  If you want a clearer proffer as to

18    what this witness will testify to, if you want to have

19    a dry run out of the presence of the jury, then ask

20    what you want to have and have not, you can do that.

21    But I don't have his testimony in front of me and I

22    only have the proffer.  And I am concerned, I think

23    you used the example:  He pulled his jacket back and
```

1  made some kind of intimidation action and the use of
2  this gun in an intimidating manner. What you are
3  doing is you are not using it for purposes of
4  identification. You are using it to show: Hey, this
5  guy is a hood, a bully, and he is intimidating and he
6  is threatening.

7       As to the use of the witnesses concerning
8  this defendant as a drug dealer, we have two
9  breakdowns. One is that -- I don't know how many
10 witnesses there are, whether it is just one or two
11 that observed -- maybe there was more that observed
12 what was happening just before the shooting. And
13 there are drug overtones, drug transaction overtones
14 to that. Then the second is: The events that took
15 place prior to the alleged confrontation between the
16 defendant and the victim which paint -- potentially
17 paint the defendant as a drug dealer. So they need to
18 be looked at separately. I think the events
19 immediately before are inextricably intertwined as in
20 Pope, but as Pope tells us, you always do a 404(b) and
21 see if it fits. It is material. It is material as to
22 why somebody shouted out "flammed". It fits into the
23 MIMIC criteria under 2 of Getz: The motive for the

1     shooting.   There will be live testimony based on the
2     proffer, which will be tested by cross-examination
3     under oath.   The acts are clearly not remote.   A
4     curative can be given.   Nothing on this aspect.   Yes,
5     it paints -- this type of testimony paints the
6     defendant as being a drug dealer, which is a prior bad
7     act.   There is nothing under the DeShields' criteria
8     when I looked at it, although the criteria that jumps
9     out, like the prior issue jumps out, this is part of
10    the State's case and it is an element -- excuse me,
11    not an element, but it is a critical part of the
12    State's case.   If you take that away, I think there is
13    a void in the State's case.   So the jury needs to
14    understand that.

15          Now, the question of Mr. Adkins:   How many
16    witnesses do you have that paint the scene, paint the
17    defendant as being a drug seller at the scene just
18    prior to the shooting?   In other words, the people
19    that were seeing what was going down with the
20    defendant and the victim?   I know there was one.   I
21    didn't know how many.

22          MR. ADKINS:   Your Honor, as part and parcel
23    of this incident, in terms of the handed drugs,

1    squealing tires, shots fired, and drug transactions,
2    we have definitely one. And, you know, it's just
3    there are others that may talk about he is there
4    hanging out at the entrance way. He approached this
5    other vehicle, they will describe, just before this
6    Bronco came up. And he went to the window and saw him
7    go up to the window of this Bronco. And, you know,
8    they aren't two feet away from him. They can't swear
9    that he handed drugs, but they know him as hanging out
10   at that entrance way and selling drugs. I mean, we
11   have probably got eight or nine people that are going
12   to be on the stand, not for that reason, but for other
13   reasons, who, when asked in our interview: Do you
14   know Ralph? Yep. Did he sell drugs? Yep. Does he
15   sell them out there at Little Creek? Yep.

16          THE COURT: I don't want eight or nine
17   witnesses painting him as a drug dealer because I
18   think that is overkill and you don't need that. I
19   think what we need to do is this -- I presumed that.
20   May be I am wrongly presuming. Mr. Adkins, the
21   initial witnesses concerning the sale of drugs will be
22   the witnesses of the event, the flamming, the
23   screaming tires?

```
 1            MR. ADKINS:  We have one, I feel, solid
 2    witness as to the event.  And the lines get real fuzzy
 3    in this, Your Honor.  We have a witness who will talk
 4    about -- well, I'm not sure.  One witness who will
 5    talk about the victim circling this area for probably
 6    30 minutes that night, about the victim coming to this
 7    area for two to three weeks, two or three times per
 8    week, and at times asking this witness where is Ralph,
 9    he hooked me up with Ralph.  We have the victim that
10    night going to another witness this very night of the
11    incident looking for drugs.  That witness tells our
12    victim:  I don't have any.  And within 30 minutes or
13    less, the incident is happening with Ralph.  We have a
14    person who has seen Ralph deliver drugs to the victim
15    during that two week period prior.
16            THE COURT:  Well, that's three witnesses.
17    What I am saying, we don't need eight.  You told me
18    three critical witnesses I think I have.  I am going
19    to allow those three witnesses, the testimony as to
20    those three witnesses because I think that lays the
21    foundation.  I am going to allow it in the State's
22    case in chief.  I am not allowing any more than that.
23    You have that and the witnesses at the particular
```

1    time.  And if you want to call -- if it becomes a

2    major issue after the defense has decided what he may

3    or may not put on, then there may be an application

4    for rebuttal witnesses on that.  In other words, what

5    you are trying to do is set the stage so that you do

6    not have the jury hearing something in a vacuum, what

7    took place three minutes before the shooting and start

8    there.  And I understand that based upon the

9    allegation, I am going to allow that.

10          .   .  All right.  Anything else that anybody wants

11   to comment on?

12          MR. HALLER:  I just want to object to your

13   ruling.  I don't object to the intertwined part that

14   you were commenting, but about the prior days, I

15   object to your ruling in that respect.

16          Now, on other things, on the scheduling, can

17   you tell us more about scheduling, when we are

18   beginning normally and when we are going to end?

19          THE COURT:  Well, I am giving this court

20   reporter a break.  He is scheduled all day on this.  I

21   will ask him that as soon as he is ready, we will get

22   started.  Then we will go with openings.  Then break

23   for lunch.  And I suspect your opening will take us to

DAVID WASHINGTON
Official Court Reporter

Tr. A-170

1    The firing of it into the air shouldn't come in

2    because that is illegal. So I object to all of those

3    aspects of that scenario that Mr. Adkins has painted

4    so far.

5        THE COURT: As to those, I am going to allow

6    the testimony on that. The criminal activity, I know

7    even with two attorneys here and a Judge, I don't know

8    what all the gun registration requirements are. It

9    probably sounds like something, you know, that there

10   should be some registration process, but I don't know

11   to private·citizens, to sell to a private citizen

12   without registering, I don't know, I don't know if

13   that's a crime. It may or may not be. We don't have

14   a handgun law like Baltimore City has where you can,

15   to possess a handgun, you have it registered and

16   requiring registration of all handguns. I'm not sure

17   even if it is under the same analysis that I made.

18       On the identification factor, it all fits in

19   and the prejudice, I think, for that allegations of

20   potential prior bad conduct coming in, it's minimal.

21   The State is trying to place a functional .380 in the

22   defendant's possession. So I am going to allow that

23   testimony.

DAVID WASHINGTON
Official Court Reporter

A-55
T. A-171

A-172

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| RALPH REED, | § |
| | § |
| Defendant Below, | § |
| Appellant, | § No. 44, 2001 |
| | § |
| v. | § Court Below: Superior Court |
| | § of the State of Delaware in and |
| STATE OF DELAWARE, | § for Sussex County |
| | § Cr.A. Nos. IS99-12-0398 |
| Plaintiff Below, | § through 0399 |
| Appellee. | § |

Submitted: July 10, 2001
Decided: July 12, 2001

Before WALSH, BERGER, and STEELE, Justices.

### O R D E R

This 12th day of July 2001, upon consideration of the briefs of the parties, it appears to the Court that:

(1)    This is an appeal from a conviction in the Superior Court following a jury trial. The appellant, Ralph Reed, Jr. ("Reed"), was convicted of murder first degree and possession of a firearm during the commission of a felony for the fatal shooting of Gregory Howard on November 23, 1999.

(2)    In this appeal, Reed asserts two claims of error: (i) that the trial court abused its discretion in admitting evidence that on prior occasions he had discharged a handgun and had been involved in drug dealing and (ii) that the court gave an