IN THE UNITED STATES DISTRICT COURT

RALPH REED
    PETITIONER

V.                         NO.      0 6 - 4 4 5

THOMAS L. CARROLL
    D.C.C. WARDEN

```
FILED
JUL 21 2006
U.S. DISTRICT COURT
DISTRICT OF DELAWARE
```

2. APPENDIX To Petitioner
MEMORANDUM OF LAW ON
BATSON WITH SUPPORTING
Jury Selection Transcripts
IN SUPPORT OF HABEAS CORPUS
RELIEF

DATE: 6-17-06

_Ralph Reed_

Delaware Correctional Center
1181 Paddock Road
Smyrna Delaware 19977

In The Superior Court OF The State OF Delaware
In And For Sussex County

State OF Delaware,                    C. No. 9911018706 (R-1)
        V.                           CRA # 99-12-0398
Ralph Reed,                          CRA# 99-12-0399
            Defendant/movant

Motion For An Evidentiary
Hearing On The Batson Claim

The movant Ralph Reed For the good
cause shown below request that the Honorable
T. Henley Graves conduct an evidentiary
hearing on the Batson claim raised in movant's
pending Motion For Postconviction Relief.

Pursuant to Super. Ct. Crim. Rule 61 (h) granting
an evidentiary hearing is in the total discretion
of the trial judge and should be granted when
justice so warrant. Webster v. State, 604 A. 2d
1364 (Del. Supr. 1992).

One of movant's Ralph Reed's claims in
support of a request For postconviction relief
is that his trial counsel provided ineffective
assistance For Failing to raise a timely and

(1)

proper objection to the prosecution (or State's) use
of their peremptory challenges to strike the only
black person, Ms. Bernice Turner, from the jury
panel. For identical reasons expressed by a white
person, Mr. Jeff Haley, who was allowed to serve on
the jury.

## The Unconstitutional Disparate
## Voir Dire Questions To Jury Panel

    To begin with, At the outsit of the jury selection,
the trial court asked the entire jury panel seven
(7) general voir dire questions :
    a) Do you know anything about this case
    through personal knowledge, discussion with
    Anyone, the news media, or any other source?
    (Tr. A-4) ;
    b) Do you know the defendant or his friends
    or relatives? (Tr. A-4) ;
    c) Do you know the attorneys in this case
    or any other attorney or employee in the
    office of the attorney General or defense
    counsel? (Tr. A-4)
    d) Do you know the victim, Gregory
    Howard? (Tr. A-6);

                        ( continue ) ...

                    (2)

e) Do you have any bias or prejudice
either for or against the state or the
defendant? (Tr. A-6);

f) Do you have any religious or conscientious
reasons as to why you cannot serve as a juror
in this case? (Tr. A-6); and

g) Is there any reason why you cannot give
this case your undivided attention and render
a fair and impartial verdict? (Tr. A-6)

Thereafter the trial court then stated to
the jury panel:

Once again, this trial will begin today
And will last approximately two weeks.
If your answers to any of the above
Questions is yes or you cannot serve
through May 19th, please come forward.
(Tr. A-6).

At that time the total of fifty one (51)
people from the jury panel responded "yes" to
the court's general voir dire questions, of which
five (5) said they know the defendant/movant
Ralph Reed or his friends or relatives. Four (4)
of these jurors Jeremy Fisher, Leona Steen,
Sandra Johnson and Amy Baker were excused
for cause by the court. (See Tr. A-9, A-18, A-28 & A-32)

After the STATE Failed to convince the trial
court to excuse the Fifth juror, Bernice Turner,
For cause (See Tr. A-23, A-30 & A-42), the STATE
later exercised one of its peremptory challenges
to eliminate the only Black juror Ms. Turner For
cause because she may have casually Known one
of the witnesses Darren Bacon's mother, at which
time the movant's trial counsel made a poor
imprecise Batson objection to the STATE's securing
an all white jury. (Tr. c-6 thru c-9). To be precise,
movant's trial counsel's objection was not based
upon his professional judgment and strategy,
stating that:

    But because of the Family's concerns,
    I wanted this expressed to the
    court, and I suppose I want to lodge
    an objection just based on the
    Family's concerns.

(Tr. c-6, c-7).

   Thus, out of the 51 jurors that responded to
the Trial court's voir dire Questions, none initially
indicated any Knowledge of Knowing the victim's
Friends or relatives because no such Question was
asked the panel as it was asked regarding the
movant's Friends or relatives. (Compare voir dire
Questions # b and # d herein above).

Furthermore, any juror who knew the victim's Friends or relatives may have felt that they were not obligated to share this important information with the court and may considered it to be insignificant.

Thus, it is common-sense logic of reality that the majority of the friends and relatives of any person is of their own race and the person of the mind to discriminate would know this reality. That statistical reality is apparent from the racial make-up of movant's all white jury selected from a discriminatory voir dire questioning policy which favor whites over blacks.

As indicated above, any member of the jury that responded affirmatively to the court's voir dire questions were not selected to serve on the movant's jury, but all the black people were either excluded by the court for cause or challenged by the state for cause.

Although there may have been several white people who were selected to serve on movant's jury that knew the victim's friends or relatives (a reason generally cited for exclusion for cause, Tr. C-8), no whites were eliminated for this reason that resulted in the removal of all the blacks.

For instance, on the second day of movant's trial a white juror, Jeff Haley, notified the court that he knew the victim's brother from

work, but stated (quote) "I know him to say hi"
(Tr. B-4). (unquote) compare with black juror Ms.
Turner's reply that (Quote) "no, I just know her";
(A-43). Nevertheless the prosecution never asked
the trial court to exclude Mr. Haley for cause as
it did with Ms. Turner. (Tr. B-4, B-5). Nor did the
trial court ask the rest of the jury members did
they know the victim's Friends or relatives. (Tr. B-5,
B-6). And movant's trial counsel kept completely
silent while the prosecution purposely discriminated
in the jury selection process by securing an all
white jury with one or more members that actually
knew the victim's Friends or relatives. (Tr. B-5, B-6).

      Trial counsel never lodged an objection over
the non-excusal of Mr. Haley based on Batson v.
Kentucky, 476 U.S. 79 (1986) where, as here, there is
disparate voir dire questioning which caused the
black venire members to be singled out and excluded
on count of their race while the white members
knowing the white victim were permitted to serve
on the jury in favor of the prosecution. Thus,
such disparate discriminatory voir dire questioning
has been condemned by the United States Supreme
Court in Miller-el v. Cockrell, 537 U.S. ____ (2003).

(6)

The STATE's Disparate Treatment OF
Similarly Situated Black And White
Jurors Is Pretext For Discrimination

Likewise disparate treatment of the races who are
Similarly Situated when exercising peremptory challenges,
As the STATE did in movant's case, is a pretext For
purposeful discrimination. See Riley v. Taylor, 277 F.3d
261, 282-83 (3d Cir. 2001). Riley is a recent Delaware
case wherein the Third Circuit Court condemned this
same exact discriminatory practice in the jury
selection process. See Harrison v. Ryan, 909 F.2d
84, 88. (3d. Cir.), cert. denied 498 U.S. 1003 (1990)
(holding that exclusion of one Black juror From
jury on the basis of race is sufficient to require a
new trial pursuant to Batson)

The Third Circuit court stated in Riley that
the Batson inquiry has been characterized as a
three-step one where "a defendant may establish
a prima Facie case of purposeful discrimination
in selection of the petit jury solely on evidence
concerning the prosecutor's exercise of peremptory
challenges at the defendant's trial. 277 F.3d AT
275. Once the defendant makes a prima Facie
showing of racial discrimination (step one), the
prosecution must articulate a race-neutral
explanation For its use of peremptory challenges (step Two).

(7)

Id. If it does so, the trial court must determine whether the defendant has established purposeful discrimination (Step Three). Id. The ultimate burden of persuasion regarding racial motivation rests with, and does not shift from, the defendant. Id. (citing Purkett v. Elem, 514 U.S. 765, 768, 115 S.CT. 1769, 131 L.Ed.2d 834 (1995).

In movant's case, although his trial counsel made a poor imprecise objection to the prosecution's use of its peremptory challenges to strike the one black juror, step one of Batson was established. (Tr. C-7).

At that time the movant's trial counsel and the prosecution attempted to satisfy Step Two of Batson by attempting to provide a race neutral reason for striking Ms. Turner relying on the Delaware Supreme Court's decision in Freddiman v. State, Del. Supr. No. 203, 1988, Holland, J. (February 22, 1989) at 15 (the state must demonstrate that the peremptory challenges were made on grounds of specific, individual juror bias or on grounds reasonably related to the particular case on trial or its particular parties or witnesses' and not solely on the grounds of the jurors' race) (Tr. C-6 to C-8). However, the Freddiman's "not solely on the... race" standard has been rejected by the Third Circuit Court in Riley and

Shown to be evident that the STATE's proffered race-neutral explanations were pretextual, because race can never play any factor at all in the jury selection process. Riley, 277 F.3d at 285.

The second problem is that the race neutral reason the STATE proffered on the record for its strike of Ms. Turner, in which the trial court acquiesce with, was a concern over the juror's mere acquaintance with one of the witnesses' mother (Tr. c-7 To c-9), a similar factor that existed with a white juror, Mr. Haley, being acquainted with the victim's brother but was still permitted to serve on the jury. (Tr. B-3 to B-6). This rationale like the Freddiman's NOT solely on race standard and the unfair voir dire questions all show the STATE's intent of disparate treatment of similarly situated Black and white jurors in the jury selection process.

The State Has NOT Satisfied The
Third Set Of Batson To Explain Its
Disparate Discriminatory Policy

When reviewing the trial record as a whole the prosecution's race neutral reasons for striking the only black juror Ms. Turner are both pretextual and inadequate to rebut movant's claim that the STATE

did not discriminate on the account of race. Thus,
the trial record also reflect that the prosecution never
offered any race neutral explanations for its
disparate treatment of similarly situated black
and white jurors or the disparate voir dire questions
As to whether any juror knows defendant's friends
or relatives while failing to propose the same question
to the jury panel concerning the victim's friends or
relatives. (See Voir Dire Questions, Tr. A-4 and A-6).

Therefore Step three of <u>Batson</u> require this court
to make the ultimate determination whether the movant
established purposeful discrimination based upon each
piece of evidence which should not be reviewed in
isolation. <u>Riley</u>, 277 F. 3d at 253. But first the State
must satisfy Step two of <u>Batson</u> which require this
court to conduct an evidentiary hearing and evaluate
all evidence introduced by each side (including all
evidence introduced in the first and second steps)
that tends to show that race was or was not the
real reason and determine whether the defendant
has met his burden of persuasion. <u>Riley</u> at 286.

As the record stand now the prosecution's explanation
are clearly pretextual for purposeful discrimination
especially when viewed together with the disparate
voir dire questions posed to the venire about movant's
friends and relatives who are black and the lack

of inquisition regarding the victim's friends and relatives who are white, because the emphasis of such disparate questions imply emphatically a deliberate intent by the State to discriminate against all movant's friends and relatives and any person who knows movant's friends and relatives who are black and a desire to exclude them from jury service from the outside of the jury selection, while permitting the victim's white friends and relatives or any person who know them who are white to serve on the jury without any inquiry to identify them at all.

This evidence, of course, is relevant and sufficient to the extent it casts doubt on the legitimacy of the motives underlying the State's actions in movant's case. Miller-el v. Cockrell, 537 U.S. _____, (2003).

Lastly, both State and Federal courts made clear that the Batson step three inquiry is not merely a formalistic one, but an integral element of the required analysis. Riley at 290-91 (citing State v. Collier, 553 So.2d 815, 821 (La. 1989) (holding that the trial judge cannot simply "[r]ubber stamp... [a prosecutor's] non-racial explanation, no matter how whimsical or fanciful... [but] in order to permit a questioned [peremptory challenge]... must conclude that the proffered reasons are, first, neutral and reasonable, and, second, not a pretext"). Id. 291 n. 11.

Wherefore, For the good cause shown above herein this court should grant movant Ralph Reed's motion to conduct an evidentiary hearing on the <u>Batson</u> Claim.

Respectfully submitted,

Ralph Reed

Ralph Reed, pro se

Delaware Correctional Center

1181 Paddock Read, Box 500

Smyrna, Delaware 19977

Dated: November 29, 2004

(13)

# Certificate of Service

I, _Ralph Reed_, hereby certify that I have served a true
and correct cop(ies) of the attached: _Motion For Evidentiary_
_Hearing_ upon the following
parties/person (s):

TO: _Karl Haller, Esq._          TO: _____

_Office of Public Defender_      _____

_14 The Circle, 2nd Floor_       _____

_Georgetown, Dela._              _____

_19947_                          _____


TO: _James W. Adkins, Esq._      TO: _____

_Department of Justice_          _____

_114 West Market Street_         _____

_Georgetown, Dela._              _____

_19947_                          _____


**BY PLACING SAME IN A SEALED ENVELOPE** and depositing same in the United
States Mail at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, DE
19977.

On this _25_ day of _November_, 2004

_Ralph Reed_

1  trial will begin today and we estimate it will take

2  two weeks.

3       Do you know anything about this case through

4  personal knowledge, discussion with anyone, the news

5  media, or any other source?

6       Do you know the defendant or his friends or

7  relatives?

8       The State is represented by James W. Adkins,

9  a Deputy Attorney General.   The defendant is

10 represented by Karl Haller.

11      Do you know the attorneys in this case or any

12 other attorney or employee in the Office of the

13 Attorney General or defense counsel?

14      Do you know any of the following persons who

15 might be called to testify as witnesses:   Detective

16 James Fraley, Delaware State Police; Detective Robert

17 Hawkins, Delaware State Police; Detective Curt Brown,

18 Delaware State Police; Detective Keith Marvel,

19 Delaware State Police; Detective Brian Conlin,

20 Delaware State Police Troop 4; Sergeant Scott

21 Galbreath, Delaware State Police Troop 2; Corporal

22 Ronald Voshell, Delaware State Police Troop 5;

23 Sergeant Steve Swain, Delaware State Police Troop 4;



1    Sharon Tull, Millsboro; Elroy Collick, Laurel,

2    Delaware.

3              Do you know the victim, Gregory Howard?

4              Do you have any bias or prejudice either for

5    or against the State or the defendant?

6              Do you have any religious or conscientious

7    reasons as to why you cannot serve as a juror in this

8    case?

9              Is there any reason why you cannot give this

10   case your undivided attention and render a fair and

11   impartial verdict?

12             Once again, this trial will begin today and

13   will last approximately two weeks.  If your answers to

14   any of the above questions is yes or you cannot serve

15   through May 19th, please come forward.

16             THE COURT:  Let me see counsel at the

17   sidebar.

18             (Whereupon, counsel approached the bench and

19        the following proceedings were had:)

20             THE COURT:  It may be helpful that since the

21   State is not seeking the death penalty that we make

22   the jury panel aware of that.

23             MR. HALLER:  Yes, I was going to ask that.


                    DAVID WASHINGTON
                  Official Court Reporter



Tr. A-6

1   Use the call-in number tomorrow night for Wednesday's

2   cases.

3          PROSPECTIVE JUROR:  All right.  Thank you.

4          (Whereupon, the juror left the bench as

5       another prospective juror approached the bench.)

6          THE COURT:  Your name for the record?

7          PROSPECTIVE JUROR:  Jeremy Fisher.  I went to

8   school with the defendant.  Also some of the other

9   officers I heard mentioned in the case.

10          THE COURT:  How old are you?

11          THE BAILIFF:  20.

12          THE COURT:  You went to Laurel High School?

13          PROSPECTIVE JUROR:  No, but I went to Cape.

14   Cape is split up between different regions.

15          THE COURT:  I will excuse you.  Use the

16   call-in number tonight for tomorrow.       .

17          PROSPECTIVE JUROR:  I'm good to go now?

18          THE COURT:  Yes.

19          (Whereupon, the juror left the bench as

20       another prospective juror approached the bench.)

21          THE COURT:  Is your client from Cape?

22          MR. HALLER:  It is probably a special school.

23          THE COURT:  Your name for the record?

DAVID WASHINGTON
Official Court Reporter



Tr. A-9

1    was the administrative assistant at a school of

2    adjudicated youth.

3            THE COURT:   I will excuse you and ask you to

4    use the call-in number tonight for tomorrow's cases.

5            (Whereupon, the juror left the bench as

6        another prospective juror approached the bench.)

7            THE COURT:   Your name for the record?

8            PROSPECTIVE JUROR:   I know Curt Brown.

9            THE COURT:   Okay.   Tell me your name for the

10   record?

11           PROSPECTIVE JUROR:   Leona Steen.

12           THE COURT:   How do you know Mr. Brown?

13           PROSPECTIVE JUROR:   I know his family over in

14   Bridgeville and Greenwood and I worked with his

15   father.

16           THE COURT:   Do you know the officer

17   personally or just know him through this family?

18           PROSPECTIVE JUROR:   I know him.   I know his

19   family.   I don't know him really well as far as

20   visiting.

21           THE COURT:   Is that just a work relationship?

22           THE DEFENDANT:   I know his parents.   We are

23   friends.

                    DAVID WASHINGTON
                  Official Court Reporter



A-5                              Tr. A-18

```
 1              THE COURT:  I will take you off this case and

 2    ask you to call in tonight for tomorrow.

 3              (Whereupon, the juror left the bench as

 4         another prospective juror approached the bench.)

 5              THE COURT:  Good morning.  Your name is?

 6              PROSPECTIVE JUROR:  Sandra Johnson.  I am

 7    familiar with one of your witnesses, a Daren Bacon.

 8    His mother and father both are real good friends of

 9    mine.

10              THE COURT:  I am going to go ahead and excuse

11    you from this case and ask you to use the call-in

12    number tonight for tomorrow.

13              (Whereupon, the juror left the bench as

14         another prospective juror approached the bench.)

15              THE COURT:  Your name?

16              PROSPECTIVE JUROR:  Catherine Taylor.  I work

17    for probation and parole.  I'm sure I signed his

18    pretrial supervision.  I do all pretrial supervision

19    in Sussex County.

20              THE COURT:  I am going to excuse you from

21    this case and ask you to use the call-in number

22    tonight for tomorrow.

23              MR. HALLER:  Nice to see your face.
```

DAVID WASHINGTON
Official Court Reporter



Tr. A - 28

```
 1              (Whereupon, the juror left the bench as
 2         another prospective juror approached the bench.)
 3              THE COURT:  Your name for the record?
 4              PROSPECTIVE JUROR:  Kendra Moore.  My father
 5    and I are building a motel in Rehoboth Beach.  I'm
 6    trying to get it opened by Memorial Day.  I have a lot
 7    of work to do.  I took a couple days off last week.
 8              THE COURT:  Ronnie your dad?
 9              PROSPECTIVE JUROR:  Kenny Simpler.
10              THE COURT:  I saw him on Friday.  He was
11    blaming me for blocking the road.  I am going to keep
12    you on the panel right now.  I tell you what, the type
13    of work you do, I know it's difficult, but you can
14    probably work around it.  My panel is getting rather
15    thin right now.
16              (Whereupon, the juror left the bench as
17         another prospective juror approached the bench.)
18              THE COURT:  Your name for the record?
19              PROSPECTIVE JUROR:  Amy Baker.  I am a social
20    worker in the Laurel School District.  I believe one
21    of the witnesses is a student in the Laurel School
22    District.  I also went to high school with another.
23              THE COURT:  Who do you think the student is?
```

DAVID WASHINGTON
Official Court Reporter   Tr. A-31

```
 1              PROSPECTIVE JUROR:  Roberta Reed.

 2              THE COURT:  The other person that you went to

 3    school with?

 4              PROSPECTIVE JUROR:  Daren Bacon.

 5              THE COURT:  Was Daren Bacon in your class?

 6              PROSPECTIVE JUROR:  Graduating class?

 7              THE COURT:  Yes.

 8              PROSPECTIVE JUROR:  I believe so.

 9              THE COURT:  All right.  I have to ask you

10    this question, I can guess it, but I need to establish

11    a record:  You are how old?

12              PROSPECTIVE JUROR:  26.

13              THE COURT:  I'm going to go ahead and excuse

14    you from this particular case and ask you to use the

15    call-in number.

16              (Whereupon, the juror left the bench as

17        another prospective juror approached the bench.)

18              MR. ADKINS:  Is there any chance we can

19    revisit Bernice Turner?

20              THE COURT:  In a moment.

21              PROSPECTIVE JUROR:  I know Detective --

22              THE COURT:  Tell me your name?

23              PROSPECTIVE JUROR:  Tammy Russum.  I haven't
```

DAVID WASHINGTON
Official Court Reporter



Tr. A-32

1              THE COURT:  I will excuse you from this

2     particular case.  I will go ahead and excuse you from

3     the -- for the week.  Go on back to work.

4              (Whereupon, the juror left the bench as

5         another prospective juror approached the bench.)

6              THE COURT:  Your name?

7  -           PROSPECTIVE JUROR:  Bernice Turner.  I know

8     one of the witnesses, Daren Bacon.

9              THE COURT:  How do you know that person?

10             PROSPECTIVE JUROR:  He's a friend of my son's

11    and I work with his mom.

12             THE COURT:  His mother also?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Do you think that may give you

15    problems sitting on the case?

16             PROSPECTIVE JUROR:  No, but I work for

17    duPont.  I have already been off one week and I think

18    two weeks would be too long.

19             THE COURT:  They are pretty good about that.

20    Do you think you can be a fair and impartial juror?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  I am keeping you on the panel.

23·            PROSPECTIVE JUROR:  Okay.


                    DAVID WASHINGTON
                 Official Court Reporter



Tr. A-30·

1            (Whereupon, the juror left the bench.)

2            THE COURT:  All right.  Let's revisit the one

3    Mr. Adkins wanted to revisit.  The name is?

4            MR. ADKINS:  Bernice Turner.  It is my

5    recollection that she says she knows Daren Bacon.  I

6    -think she actually works with Daren's mother.  Daren

7    Bacon is a close friend of the defendant, Ralph Reed.

8    He was present at the -- near the entrance way when

9    this shooting took place by Ralph Reed.  Daren Bacon,

10   Mashika Williams and Sharnelle West were all hanging

11   out with Ralph Reed that night.  Although we will call

12   them as witnesses because we want to present the

13   complete case, we will end up by summation, without

14   saying they are liars, calling all three of them liars

15   and in cahoots with Ralph Reed, the defendant.  So

16   Daren Bacon will be a very controversial witness.  I

17   am very uncomfortable with someone who knows him and

18   knows his mother sitting on this jury.

19           THE COURT:  What's the name again?

20           MR. ADKINS:  Bernice Turner.

21           THE COURT:  Bernice Turner, if you would come

22   to the bar for a moment.

23           (Whereupon, Bernice Turner approached the

DAVID WASHINGTON
Official Court Reporter

Tr. A-42

1    bench.)

2            THE COURT:  Mr. Bacon's mother you say you

3    work with?

4            PROSPECTIVE JUROR:  Yes.

5            THE COURT:  Where do you work?

6            PROSPECTIVE JUROR:  DuPont.

7            THE COURT:  Does she work the same shifts?

8            PROSPECTIVE JUROR:  No, different shifts.

9            THE COURT:  Are you good friends with her at

10    work?

11            PROSPECTIVE JUROR:  No, I just know her.

12            THE COURT:  Would you be uncomfortable being

13    on a case where you have to determine the credibility

14    of her son one way or the other?

15            PROSPECTIVE JUROR:  No.

16            THE COURT:  One of the jury's

17    responsibilities is to decide whether someone is more

18    credible or less credible than another witness.  Do

19    you think you can do this and be a fair and impartial

20    juror?

21            PROSPECTIVE JUROR:  Yes, because I'm a

22    Christian.

23            THE COURT:  At this point I am keeping you on

DAVID WASHINGTON
Official Court Reporter

Tr. A-43

1    the panel.

2                  (Whereupon, the juror left the bench.)

3                  THE COURT:  Exceptions?

4                  MR. HALLER:  None.

5                  MR. ADKINS:  No.

6                  THE COURT:  Let's get started.  Then we will

7    take up the 404(b) issue and the other issue.  I

8    probably will have six alternates because of the long

9    period and so many witnesses.  I would be shocked if

10   somebody didn't say they recognize them by faces and

11   names.

12                 MR. ADKINS:  We are asking for sequestration.

13                 THE COURT:  I will enter the sequestration

14   order at this point in time.  Remind me.  I am asking

15   each of you to directly discuss this sequestration

16   order with all your witnesses, making them aware that

17   they are not to discuss the case except with you.  We

18   all know the bounds of it, not to discuss their

19   testimony after one has testified, not to exchange

20   what questions were asked or anything of that nature.

21   If you want them all brought in, they probably will be

22   sequestered on different days and I won't have an to

23   say that to the whole group.

                    DAVID WASHINGTON
                  Official Court Reporter

                                        Tr. A-44

B-3

```
 1                        *    *    *

 2                      PROCEEDINGS

 3                     *    *    *

 4          THE COURT:  Good morning.

 5          MR. ADKINS:  Good morning.

 6          THE COURT:  Mr. Haller, I knew that you

 7   weren't going to be able to be around, I had a

 8   transcript done of the return on the capias for you so

 9   that you would have it since the State was present and

10   a witness was kept on a $5,000 cash bond.  So that's

11   what took place.  It's an important case and that's at

12   the Court's expense.

13          MR. HALLER:  I know.

14          THE COURT:  All right.  We ready to bring the

15   jury in?

16          THE BAILIFF:  Your Honor, No. 2 on the jury

17   needed to speak with you.

18          THE COURT:  I will see counsel at the sidebar

19   with Juror No. 2.

20          (Whereupon, counsel and Juror No. 2

21       approached the bench and the following

22       proceedings were had:)

23          THE COURT:  Hello.  Your name?
```

DAVID WASHINGTON *Exhibit A*
Official Court Reporter

*Tr. B-3*

```
 1              JUROR No. 2:  Jeff Haley.  Yesterday I

 2    recognized somebody in the gallery, a fellow by the

 3    name of Robert Howard.  He worked at the Indian River

 4    Power Plant.  He worked for a company that do all the

 5    asbestos abatement.  I know him to say hi.  I thought

 6    I ought to make you aware.

 7              THE COURT:  He would be, Mr. Adkins?

 8              MR. ADKINS:  I would rather not say in the

 9    presence of the juror.  You know, if he doesn't

10    know --

11              THE COURT:  Well --

12              MR. ADKINS:  Whatever you want, Your Honor.

13    I can say it.

14              THE COURT:  Step away one moment.

15              (Whereupon, Juror No. 2 stepped away from the

16         bench.)

17              MR. ADKINS:  He is the brother of the victim.

18              THE COURT:  That's what I wanted to know.  I

19    want to know if that will have an impact.  I put two

20    and two together and noticed he is part of the family.

21              MR. ADKINS:  Okay.

22              (Whereupon, Juror No. 2 approaches the

23         bench.)
```

DAVID WASHINGTON $Exhibit A$
Official Court Reporter

$Tr. B-4$

1          THE COURT:  I am told he is the brother of

2    the victim in this case.  And what I need to know from

3    you is:  Would that have an effect on your ability to

4    be a fair and impartial juror?

5          JUROR No. 2:  No.  I thought I should make it

6    aware that I seen him around the plant.

7          THE COURT:  Would it cause you any trouble or

8    things of that nature?  Let me give you a

9    hypothetical:  If you met this person at the job or

10   plant and you determined that a verdict should be not

11   guilty, would this cause you any trouble?

12          JUROR No. 2:  Not at all.

13          THE COURT:  If you determined that the

14   verdict should be guilty, would that give you any

15   trouble?

16          JUROR No. 2:  No, not at all.

17          THE COURT:  Do you think you can listen to

18   the evidence and be a fair and impartial juror?

19          JUROR No. 2:  Certainly.

20          THE COURT:  I ask you to step away.

21          (Whereupon, Juror No. 2 stepped away from the

22     bench.)

23          THE COURT:  Any questions?

Exhibit A

DAVID WASHINGTON
Official Court Reporter

Tr. B-5

1            THE COURT:  I'll leave it up to you all.

2            MR. ADKINS:  I'd rather she be here for the

3    day.

4            MR. HALLER:  The value would be minimal.

5            THE COURT:  All right.

6            MR. HALLER:  I don't care.  That's their

7    decision.  Okay.  I've got two matters I need to

8    address.

9            THE COURT:  Yes.

10            MR. HALLER:  All right.  First of all is

11    the selection of the jury, Your Honor.  Both the

12    family and the defendant expressed to me the problem

13    we have here, at least from the defense standpoint,

14    it being an all white jury.  And in the jury

15    selection process, as I recall, there was one black

16    that was selected and that person was challenged by

17    the State.  That was the only minority that was

18    selected to the jury box during that process.

19            Now, having had the Feddiman case -- and I

20    don't remember whether that was you or whether it

21    was some other judge -- that was like five years

22    ago.  I think the State exercised four strikes and

23    they were all against four black people, and didn't

KATHY S. PURNELL  Exhibit
OFFICIAL COURT REPORTER

Tr. C-6

```
 1    exercise any against the white people.  The Supreme
 2    Court said there wasn't any problem.  I didn't think
 3    I really had any standing or could object based on
 4    the law.  But because of the family's concerns, I
 5    wanted this expressed to the Court, and I suppose I
 6    want to lodge an objection just based on the
 7    family's concerns.
 8         THE COURT:  Well, let me just say this.
 9    This Court and the Supreme Court, the striking of
10    the four blacks without any other information, is
11    inappropriate in the Feddiman case and all the cases
12    that this Court has ruled on and the Supreme Court
13    has ruled on.
14         If under Batson a pattern is established or
15    noted by the Court, the Court requests race neutral
16    reasons for the strike.  If race neutral reasons are
17    given -- for example, many people in this Court are
18    stricken regardless of race because they may have a
19    misdemeanor record.  You can be used as a juror with
20    a misdemeanor record.  So I think that was the
21    situation in Feddiman.
22         In this situation, we have one black that
23    was struck.  That black, I think, also was the
```

KATHY S. PURNELL  Exhibit
OFFICIAL COURT REPORTER

Tr. C-7

1    person that the State sought to have stricken for

2    cause at sidebar because that person worked with

3    Mr. Bacon's mother at the duPont plant and had some

4    acquaintance with Mr. Bacon, but still said she

5    thought she could be a fair and impartial juror.  So

6    I made the presumption that I expected, if she was

7    called, that the State would probably strike her

8    based on that, and you probably thought the same

9    thing.

10           But I'll let Mr. Adkins and Ms. Tsantes

11    speak for themselves.  They're not required to.

12    Because I don't think that under Batson -- they've

13    struck one person.  If you want to limit the issue,

14    we can speak to it briefly now.

15           MR. HALLER:  I share your recollection as

16    regards to the events you just recited.

17           MR. ADKINS:  And your recollection is

18    100-percent accurate, Your Honor.  We did strike for

19    cause.  We pointed out at sidebar that Darren Bacon

20    would be at controversial witness, that he may be a

21    witness that's hostile to the State, that we may

22    have to end up arguing that he's not being

23    completely truthful.  We certainly didn't want a

KATHY S. PURNELL Exhibit
OFFICIAL COURT REPORTER

Tr. C-8

1    person on the jury that had any type of connection

2    with Darren Bacon or his mother, judging Darren

3    Bacon's credibility who we felt his credibility

4    would be very much in question in this trial.

5            THE COURT: All right. I'm satisfied, and

6    I'm satisfied as to the timeliness. I also note

7    that -- and I don't have the numbers as to the

8    entire panel. But there were some blacks that were

9    excused on the voir dire, either for cause

10   because -- well, it would have been for cause. Some

11   knew the defendant, some were involved in agencies

12   that had contact with the defendant or potential

13   contacts. I think there was a pre-trial services

14   lady, things of that nature.

15           So for purposes of the timeliness or the

16   lack of timeliness and for good cause shown by the

17   State, I find nothing wrong with the striking of the

18   sole black.

19           MR. HALLER: All right. The second issue,

20   it deals with a witness which I think we may be

21   getting today by the State, Kenyon Horsey. There

22   are evidentiary matters, but I'll bring those up

23   later when we get closer to that witness. However,

KATHY S. PURNELL   Exhibit
OFFICIAL COURT REPORTER
Tr. C-9